[L.A. No. 30703. Nov. 18, 1977.]

JAPAN LINE, LTD., et al., Plaintiffs and Respondents, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

John H. Larson, County Counsel, and James Dexter Clark, Deputy County Counsel, for Defendants and Appellants.

Graham & James, Reed M. Williams, Ronald L. Young, Peter L. Briger, Briger & Associates, Sheldon S. Cohen and Cohen & Uretz for Plaintiffs and Respondents.

## OPINION

MANUEL, J.—In this action for recovery of ad valorem personal property taxes paid under protest, defendants City of Los Angeles and County of Los Angeles appeal from a judgment entered after a nonjury trial in favor of plaintiffs and against defendants for the recovery of said taxes together with interest and costs. After decision by the Court of Appeal, Second Appellate District, Division Three, reversing the judgment, we granted a hearing in this court for the purpose of giving further consideration to the issues raised. Having made a thorough examination of the cause, we have concluded that the opinion of the Court of Appeal prepared by Justice Cobey and concurred in by Acting Presiding Justice Allport and Justice Potter correctly treats and disposes of the issues involved and we adopt such opinion as and for the opinion of this court. That opinion (with appropriate additions and deletions) is as follows:*

The sole question presented by this appeal upon an agreed statement from a tax refund judgment is whether appellants, the County of Los

---

*Brackets together, in this manner [] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

Angeles and the City of Los Angeles, may impose an apportioned ad valorem tax upon cargo shipping containers, taxed in Japan, used here essentially exclusively in foreign commerce and owned and controlled by Japanese taxpayers. These taxpayers are six shipping lines incorporated under the laws of Japan which have their principal places of business and commercial domiciles there.

## FACTS

The facts as stipulated between the parties disclose that the containers at issue are in constant transit save for repair time and time awaiting new cargo. They are only intermittently physically present within the jurisdictions of appellants for an average stay of less than three weeks. They are used exclusively for the transportation of cargo for hire in foreign commerce. They are either full or empty. The full containers are loaded with cargo inbound from or outbound to foreign ports. The empty containers are moved intrastate within California and interstate from California solely to pick up cargo to be carried in foreign commerce or to return the containers themselves to ports (principally Los Angeles) for placement aboard the taxpayers' outbound vessels. The containers are never used for either intrastate or interstate transportation of cargo except in continuation of international voyages.

### The Taxpayers' Contentions

Since the judgment under appeal was rendered, [] [this court] decided unanimously in the case of *Sea-Land Service, Inc.* v. *County of Alameda* (1974) 12 Cal.3d 772, 775-776 [117 Cal.Rptr. 448, 528 P.2d 56], that a California county may tax such containers, under circumstances of use essentially identical to those before us, where the containers were used mainly in foreign commerce[1] but were owned by a shipping company incorporated and commercially domiciled within this country.

The taxpayers contend that the *Sea-Land* decision is not dispositive of this case because, there, Sea-Land conceded that its containers were subject to local taxation within the United States. Its position was that such taxation must be done exclusively at the home port of its vessels. (*Sea-Land, supra,* at pp. 781, 786.) Here, the home ports of the taxpayers'

---

[1] The interstate commerce therein involved was via international waters between California and the East Coast of the United States. (*Sea-Land, supra,* at p. 776.) [] [This] court made no distinction between the containers used in foreign commerce and those used in intercoastal commerce.

vessels, which are specifically designed to carry the containers at issue, are in Japan. The taxpayers' vessels are likewise registered there rather than in the United States.

The initial position of the taxpayers on this appeal was that under both the home-port doctrine and the most favored nation provisions of the 1953 treaty between the United States and Japan their containers are not subject to taxation by any jurisdiction except Japan.[2] In this connection, we note that the containers of the taxpayers are subject to property taxation in Japan and have actually been so taxed there. Similar containers, similarly used in Japan but owned and controlled by steamship companies domiciled in the United States, have not been so taxed there.

At oral argument [before the Court of Appeal] counsel for the taxpayers advanced a new ground and an additional factual basis for their position that their containers, notwithstanding the continuous use of the containers in the United States within appellants' jurisdictions, are not subject to property taxation by any government except that of Japan. They there argued that the property taxes at issue constitute indirect tonnage duties prohibited by article I, section 10, clause 3 of the United States Constitution and, in support of one of their initial contentions that these taxes are also prohibited by applicable treaties, called our attention for the first time to the existence of the supplementary convention of 1964 (15 U.S.T. 1824) to the 1939 convention between Sweden and the United States on double taxation. (54 Stat. 1759.)

We could disregard this new matter without any consideration thereof because, without any showing of justification therefor, it was presented after the normal briefing process had been concluded. (See *Lotts* v. *Board of Park Commrs.* (1936) 13 Cal.App.2d 625, 636 [57 P.2d 215]; *Sinclair* v. *Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216, 229 [116 Cal.Rptr. 654].) But in the interest of being as fully informed as reasonably possible on the fundamental tax issue presented, [] [the Court of Appeal] waived this obvious impropriety in the taxpayers' appellate

---

[2]The taxpayers do not now claim though that their cargo containers have not acquired a taxable situs within California. In any event, the following language [] in *Sea-Land, supra*, 12 Cal.3d at page 778, would appear to be entirely apposite: "While no specific container may be in the county for a substantial period of time, Sea-Land's containers are physically present in the county on every day of the year. Such habitual presence of containers creates a taxable situs, even though the identical containers are not there every day and even though none of the containers is continuously within the county." (Citations omitted.)

procedure and asked for and obtained from the parties supplemental briefs on the new matter.

## DISCUSSION

### 1. *The Home-port Doctrine*

■ The taxpayers concede that in the field of interstate commerce the home-port doctrine has been superseded by the apportionment doctrine, but they argue that it is still extant in the area of foreign commerce where apportionment cannot be substituted except perhaps by treaty or other agreement. [] [They urge that] in *Scandinavian Airlines System, Inc.* v. *County of Los Angeles* (1961) 56 Cal.2d 11, 15, 17, 33, 36-37 [14 Cal.Rptr. 25, 363 P.2d 25] (hereafter *SAS*), [this court] applied the home-port doctrine to foreign owned, based, registered and taxed airplanes flying exclusively in foreign commerce and using Los Angeles quite infrequently as their sole United States terminus and thereby struck down the apportioned property taxes upon such planes which appellants had imposed.

[] [However, in *Sea-Land* we specifically addressed this very contention (12 Cal.3d at pp. 784-786), namely that the home-port doctrine retained vitality with respect to foreign commerce as distinguished from interstate commerce pursuant to our decision in *SAS,* and clearly rejected it. First, we concluded that "we are not inhibited by *SAS* from concluding that the home-port doctrine does not shield the property of a taxpayer from a fairly apportioned ad valorem tax levied by a nondomiciliary jurisdiction with which the taxpayer has sufficient contacts, even if the taxpayer is engaged in foreign commerce . . . . The principles of apportioned taxation enunciated in *Pullman, Ott* and *Braniff* are to be applied to instrumentalities so engaged." (*Id.* at p. 786.) Second, we specifically adopted the reasoning of Justice Traynor in his dissent in *SAS* to the effect that the threat of double taxation from foreign taxing authorities has no role in commerce clause considerations of multiple burdens, since burdens in international commerce are not attributable to discrimination by the taxing state and are matters for international agreement. (*Id.* at p. 788.)

The only asserted distinction between the case at bench and *Sea-Land* is that the cargo shipping containers in *Sea-Land* were owned by a

United States corporation whereas the containers herein are owned by foreign corporations. The taxpayers have failed to cite any authority which would support a conclusion that instrumentalities of commerce used in foreign commerce are subject to different constitutional protection depending upon whether they are owned by foreign or domestic corporations. Existing authority supports the opposite conclusion. For example in *Canadian Pac. Ry. Co.* v. *King Co.* (1916) 90 Wash. 38 (155 P. 416) the Washington Supreme Court rejected the home-port doctrine and applied to a Canadian railway corporation the apportionment rule applied by the United States Supreme Court to the rolling stock of a domestic railway corporation used in foreign commerce in *Pullman's Car Co.* v. *Pennsylvania* (1891) 141 U.S. 18, 23 (35 L.Ed. 613, 616, 11 S.Ct. 876). *Sea-Land* is fully dispositive of the commerce clause and federal exclusivity issues raised in the case at bench.]

## 2. *The Tonnage Duty Prohibition*

Article I, section 10, clause 3 of the United States Constitution prohibits the imposition by states [] of tonnage duties. ▆ The taxpayers contend that this prohibition invalidates the local property taxes at issue since they in practical effect are tonnage duties upon the cargo containers.

We disagree. In the recent case of *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276 [46 L.Ed.2d 495, 96 S.Ct. 535], the United States Supreme Court held that the assessment by Georgia of a nondiscriminatory ad valorem property tax against imported tires was not within the constitutional prohibition against the laying of any impost or duty on imports. In support of this holding the court pointed out that imposts and duties "are essentially taxes on the commercial privilege of bringing goods into a country," while nondiscriminatory ad valorem property taxes of the kind before us are taxes by which a state apportions the costs of its general services among the beneficiaries thereof (*Michelin, supra,* at pp. 286-287 [46 L.Ed.2d at pp. 503-504]) and that the words "imposts" and "duties," as used in 1787, clearly meant only "exactions upon imported goods *as imports.*" (Italics added.) (*Id.* at pp. 290-291, 283 [46 L.Ed.2d at pp. 506, 502].)[3] []

---

[3] In *Sea-Land, supra,* 12 Cal.3d at page 789, [] [we] expressly rejected the contention that the similar cargo containers therein involved were exempted from local property taxation by the [] [import-export] clause of the United States Constitution. [] [T]he

[The taxpayers contend that the *Michelin* holding that a nondiscriminatory ad valorem property tax was not an "impost" or "duty" is not determinative of the case at bench because the cargo containers herein were in import-export transit. They urge that the court in *Michelin* specifically stressed that the goods in that case were no longer in import transit. (See 423 U.S. at pp. 286, 302 [46 L.Ed.2d at pp. 503-504, 512].) The contention is of no avail to taxpayers.

The cargo containers are not being taxed while in transit. Rather they are being taxed on an apportioned basis for their continuous presence in the state. Some containers are continuously present in the state throughout the year, even though not necessarily the same containers. The continuous presence of these containers, as well as any instrumentality of commerce, involves the constant use of many services provided by the state and, here, local entities; e.g., harbor facilities, roads, bridges, water supply, as well as fire and police protection. The Supreme Court has held that states may impose a property tax on these moving instrumentalities of commerce on an apportioned basis in order to meet the expenses of services within the taxing jurisdiction. (*Clyde Mallory Lines* v. *Alabama* (1935) 296 U.S. 261, 265-266 [80 L.Ed. 215, 218-219, 56 S.Ct. 194]; *Cox* v. *Lott* (1871) 79 U.S. (12 Wall.) 204, 213 [20 L.Ed. 370, 373]; *Pullman's Car Co.* v. *Pennsylvania, supra,* 141 U.S. 18.) In *Sea-Land* we affirmed the apportionment formula used in the case at bench to determine the continuous presence of the cargo containers there involved. It is the continuous presence within the jurisdiction drawing upon the service of that jurisdiction to a significant degree which permits reimbursement through nondiscriminatory property taxation as opposed to the fleeting presence of imported goods in transit which may possibly be exempted from such taxation by *Michelin*.

If *Michelin* is inapplicable to resolution of the issues herein as taxpayers contend, then the traditional tonnage clause analysis applies, viz., while the tonnage clause prohibits states from taxing access to their territories, it does not prohibit states from making charges for services rendered and enjoyed by those instrumentalities of foreign or interstate commerce within their jurisdiction. (*Clyde Mallory Lines* v. *Alabama, supra,* 296 U.S. 261, 265-266 [80 L.Ed. 215, 218-219]; *Cox* v. *Lott, supra,* 79 U.S. (12 Wall.) 204, 213 [20 L.Ed. 370, 373].) The court in *Michelin*

---

protection against local taxation afforded by that clause extended only to goods and commodities in the import-export stream and not to the containers which were merely a means of transport suitable for repeated use.

pointed out that nondiscriminatory ad valorem property taxes are taxes by which the state apportions the costs of services, such as police and fire protection. (423 U.S. at p. 287 [46 L.Ed.2d at p. 504].) Even under traditional tonnage clause analysis this property tax would be valid.

Thus plaintiffs' further insistent assertion that the tax liability is created by entry into the taxing jurisdiction must fall and with it the contention that the tax herein is a tonnage duty levied upon the entry of the containers into the jurisdiction.]

### 3. *The Treaty Question*

■ The taxpayers contend that the local taxation at issue violates certain treaty obligations of the United States and is therefore invalid under the supremacy clause of the United States Constitution (art. VI, cl. 2). (*SAS, supra,* 56 Cal.2d 11, 37.) In support of this contention they point out first, that the aforementioned 1953 treaty between the United States and Japan (4 U.S.T. 2063) contains most favored nation provisions with respect to the ownership and possession of movable property and taxes. (Art. IX, § 2; art. XI, § 3; art. XXII, § 2; 4 U.S.T. 2071, 2072, 2079.) They then note that in the just-mentioned *SAS* case [] [we] held that the terms of the previously mentioned 1939 convention between the United States and Sweden respecting double taxation (54 Stat. 1759) prevented appellants herein from generally taxing Swedish-owned property, including particularly airplanes (56 Cal.2d at p. 39) and, therefore, the Japanese-owned containers before us are likewise exempt from taxation by appellants pursuant to the just mentioned most favored nation provisions of the 1953 treaty between the United States and Japan. [] [This court in *SAS*] based its holding largely on the provisions of article XIII, subdivision 2 of the Swedish convention (54 Stat. 1766), applying generally apparently to movable property, but the taxpayers argue that their containers are also exempt from local property taxation by appellants under other provisions of the aforementioned Swedish convention (arts. IV and XIII, subd. (1)(b); 54 Stat. 1761, 1766) exempting instrumentalities of foreign commerce (i.e., ships and airplanes). Finally, the taxpayers argue that by reason of the modification made in the Swedish convention by the aforementioned 1964 supplementary convention thereto (15 U.S.T. 1825) the local property taxation of appellants at issue is precluded by the provision in the convention prohibiting nonreciprocal taxation.[4]

---

[4]The supplementary convention, among other things, replaced paragraph 7 of its protocol (54 Stat. 1777) with a new paragraph 7, reading as follows:

We reject the foregoing argument totally. We do not think that either the holding of the *SAS* case or the supplementary convention (which came into existence after the *SAS* decision) invalidates appellants' nondiscriminatory ad valorem taxation of these containers. The *SAS* holding on its facts prohibits only local taxation of foreign owned, based and registered *airplanes.* (56 Cal.2d at p. 42.) It does not apply to cargo containers as such. The taxpayers seek to extend this holding nevertheless and the relevant treaty prohibitions as well by describing both the airplanes involved in the *SAS* case and the containers involved here as instrumentalities of commerce. This generic description of ships and airplanes does not appear in the relevant provisions of the 1939 convention between Sweden and the United States. [] In any event, so far as the convention with Sweden is concerned, [] [as] Justice Traynor pointed out in his dissent in the *SAS* case that, properly interpreted, this treaty does not apply to local property taxation at all. (56 Cal.2d at pp. 47-48.)

The same thing, however, cannot be said with respect to the supplementary convention thereto. ■ ■ But in advising ratification by the United States of this convention, the United States Senate did so on the basis of a report from its Foreign Relations Committee, which stated that the replacement paragraph in its protocol (which we quoted in fn. 4) merely restated "for the sake of clarity" the requirement of its predecessor paragraph of nondiscriminatory tax treatment as between citizens and noncitizens (Tax Conventions and Protocols with Luxembourg, the Netherlands, Sweden and Japan, Rep. of the Sen. Foreign Relations Com., Ex. Rep. No. 10, 88th Cong., 2d Sess. at p. 65 (1964)).[5] Admittedly, the taxation at issue in this case does not violate this requirement.

"7. The citizens of one of the contracting States shall not, while resident in the other State, be subject therein to other or more burdensome taxes than are citizens of that other State residing in its territory. The term 'citizens' as used in this paragraph, includes also all legal persons, partnerships, and associations created or organized under the laws in force in the respective contracting State. In this paragraph the word 'taxes' means taxes of every kind or description, whether Federal[,] state, or municipal." (15 U.S.T. 1831-1832.)

[5] In determining the effect of an international agreement as domestic law, a court of the United States is to some extent required to take into account domestic sources in the formation of an international agreement such as committee reports indicative of the meaning that the United States Senate has attached to an international agreement in cases where the agreement, as a matter of internal law, requires the assent of the Senate (Rest.2d Foreign Relations Law of the U.S. (1965) § 151, com. (b)(i), pp. 462-463; compare Traynor, J., dissent, *SAS, supra,* 56 Cal.2d at p. 48).

## DISPOSITION

The judgment is reversed.

[]

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Jefferson, J.,* concurred.

Respondents' petition for a rehearing was denied December 28, 1977, and the opinion was modified to read as printed above.

*Assigned by the Chairperson of the Judicial Council.