# JAPAN LINE, LTD., ET AL. *v.* COUNTY OF LOS ANGELES ET AL.

No. 77–1378.   Argued January 8, 1979—Decided April 30, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting statement, *post*, p. 457.

*Peter L. Briger* argued the cause for appellants. With him on the briefs were *Sheldon S. Cohen* and *Reed M. Williams.*

*James Dexter Clark* argued the cause for appellees. With him on the briefs was *John H. Larson.*

*Kent L. Jones* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorneys General Babcock* and *Ferguson, Leonard Schaitman,* and *Ernest J. Brown.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether a State, consistently with the Commerce Clause of the Constitution, may

---

*Briefs of *amici curiae* urging reversal were filed by *Gary J. Torre* and *Arthur K. Mason* for Aer Lingus et al.; by *Edward A. McDermott* and *Allen R. Snyder* for the Council of European and Japanese National Shipowners' Assns.; and by *James W. McGrath* for Sea Land Service, Inc.

Briefs of *amici curiae* urging affirmance were filed by *Evelle J. Younger,* Attorney General, *Ernest P. Goodman,* Assistant Attorney General, and *Philip C. Griffin* and *Patti S. Kitching,* Deputy Attorneys General, for the State of California; and by *William D. Dexter* for the Multistate Tax Commission.

Briefs of *amici curiae* were filed by *George S. Lapham, Jr.,* and *Kathleen O. Argiropoulos* for Air New England, Inc., et al.; by *Jay D. Howell, Jr.,* for the city of Houston; and by *Dennis J. Kenny* for the Institute of International Container Lessors, Ltd.

impose a nondiscriminatory ad valorem property tax on foreign-owned instrumentalities (cargo containers) of international commerce.

## I

The facts were "stipulated on appeal," App. 29, and were found by the trial court, *id.*, at 33–36, as follows:

Appellants are six Japanese shipping companies; they are incorporated under the laws of Japan, and they have their principal places of business and commercial domiciles in that country. *Id.*, at 34. Appellants operate vessels used exclusively in foreign commerce; these vessels are registered in Japan and have their home ports there. *Ibid.* The vessels are specifically designed and constructed to accommodate large cargo shipping containers.[1] The containers, like the ships, are owned by appellants, have their home ports in Japan, and are used exclusively for hire in the transportation of cargo in foreign commerce. *Id.*, at 35. Each container is in constant transit save for time spent undergoing repair or awaiting loading and unloading of cargo. All appellants' containers are subject to property tax in Japan and, in fact, are taxed there.

Appellees are political subdivisions of the State of California. Appellants' containers, in the course of their inter-

---

[1] "A container is a permanent reusable article of transport equipment . . . durably made of metal, and equipped with doors for easy access to the goods and for repeated use. It is designed to facilitate the handling, loading, stowage aboard ship, carriage, discharge from ship, movement, and transfer of large numbers of packages simultaneously by mechanical means to minimize the cost and risks of manually processing each package." Simon, The Law of Shipping Containers, 5 J. Mar. L. & Com. 507, 513 (1974).

See Customs Convention on Containers, Art. I (*b*), May 18, 1956, [1969] 20 U. S. T. 301, 304, T. I. A. S. No. 6634. Although containers may be as small as 1 cubic meter (35.3 cubic feet), 49 CFR § 420.3 (c)(5) (1977), they are typically 8 feet high, 8 feet wide, and between 8 and 40 feet long. Simon, 5 J. Mar. L. & Com., at 510.

national journeys, pass through appellees' jurisdictions intermittently. Although none of appellants' containers stays permanently in California, some are there at any given time; a container's average stay in the State is less than three weeks. *Ibid.* The containers engage in no intrastate or interstate transportation of cargo except as continuations of international voyages. *Id.,* at 30. Any movements or periods of nonmovement of containers in appellees' jurisdictions are essential to, and inseparable from, the containers' efficient use as instrumentalities of foreign commerce. *Id.,* at 35–36.

Property present in California on March 1 (the "lien date" under California law) of any year is subject to ad valorem property tax. Cal. Rev. & Tax. Code Ann. §§ 117, 405, 2192 (West 1970 and Supp. 1979). A number of appellants' containers were physically present in appellees' jurisdictions on the lien dates in 1970, 1971, and 1972; this number was fairly representative of the containers' "average presence" during each year. App. 35. Appellees levied property taxes in excess of $550,000 on the assessed value of the containers present on March 1 of the three years in question. *Id.,* at 36. During the same period, similar containers owned or controlled by steamship companies domiciled in the United States, that appeared from time to time in Japan during the course of international commerce, were not subject to property taxation in Japan, and therefore were not, in fact, taxed in that country. *Id.,* at 35.

Appellants paid the taxes, so levied, under protest and sued for their refund in the Superior Court for the County of Los Angeles. That court awarded judgment in appellants' favor.[2] *Id.,* at 39–40. The court found that appellants' containers were instrumentalities of foreign commerce that had their home ports in Japan where they were taxed. The federal courts, however, in the trial court's view, had "consistently held that vessels which are instrumentalities of foreign com-

---

[2] The opinion of the Superior Court is not officially reported.

merce and engaged in foreign commerce can be taxed in their home port only." *Id.,* at 24. This rule, said the court, was necessary to avoid multiple taxation, *id.,* at 23; whereas apportionment of taxes can be used to prevent duplicative taxation in interstate commerce, apportionment is "not practical" when one of the taxing entities is a foreign sovereign. In such cases, "[t]here is no tribunal that can adjudicate [competing] rights unless it be the International Court and to invoke its services jurisdiction must be consented to by all parties." *Id.,* at 24. The application of appellees' taxes in derogation of the "home port doctrine," the court concluded, subjected international commerce to multiple taxation and thus was unconstitutional under the Commerce Clause. In so holding, the court followed *Scandinavian Airlines System, Inc.* v. *County of Los Angeles,* 56 Cal. 2d 11, 363 P. 2d 25, cert. denied, 368 U. S. 899 (1961) (hereinafter *SAS*) (ruling that ad valorem property tax levied by California upon aircraft owned, based, and registered abroad and used exclusively in international commerce, was unconstitutional under the Commerce Clause).

The Court of Appeal reversed. 132 Cal. Rptr. 531 (1976). The court appeared to conclude that *SAS* had been effectively overruled by *Sea-Land Service, Inc.* v. *County of Alameda,* 12 Cal. 3d 772, 528 P. 2d 56 (1974). In *Sea-Land,* the Supreme Court of California had criticized the home port doctrine and labeled it "anachronistic," and had upheld apportioned property taxation of containers owned by a domestic corporation and used in both intercoastal and foreign commerce. *Id.,* at 787, 528 P. 2d, at 66. The Court of Appeal rejected appellants' arguments that a different result was required here in view of their containers' foreign ownership and exclusively international use. The court likewise dismissed any argument as to multiple taxation. "[T]he possibility of international double taxation of instrumentalities of foreign commerce," it concluded, is "no reason to limit the local power to

tax them upon a nondiscriminatory apportioned basis." 132
Cal. Rptr., at 533.[3]

The California Supreme Court granted a hearing of the
case and it, too, reversed the judgment of the Superior Court,
essentially adopting the opinion of the Court of Appeal. 20
Cal. 3d 180, 571 P. 2d 254 (1977). It concluded that "the
threat of double taxation from foreign taxing authorities has
no role in commerce clause considerations of multiple burdens,
since burdens in international commerce are not attributable
to discrimination by the taxing state and are matters for inter-
national agreement." *Id.*, at 185, 571 P. 2d, at 257. Deem-
ing the containers' foreign ownership and use irrelevant for
purposes of constitutional analysis, *id.*, at 186, 571 P. 2d, at
257–258, the court rejected appellants' Commerce Clause
challenge and sustained the validity of the tax as applied.[4]

---

[3] The Court of Appeal also rejected, 132 Cal. Rptr., at 534, appellants'
argument that California's tax was prohibited by Art. XI, §§ 1 and 4, and
by Art. XXII, § 2, of the Treaty of Friendship, Commerce and Navigation
Between the United States of America and Japan, Apr. 2, 1953, [1953]
4 U. S. T. 2063, T. I. A. S. No. 2863 (providing that Japanese nationals
residing in the United States may not be subjected to payment of taxes
"more burdensome than those borne by" United States nationals, and ac-
cording Japan "most favored nation" status). Appellants repeat this
argument here, and we reject it. The provisions appellants cite interdict
*discrimination* against Japanese nationals; there is no evidence that Cali-
fornia has treated Japanese containers differently from domestic containers
for purposes of applying its property tax.

The Court of Appeal likewise rejected, 132 Cal. Rptr., at 533, appellants'
argument that California's tax constituted an indirect "Duty of Tonnage"
proscribed by U. S. Const., Art. I, § 10, cl. 3. Appellants repeat this argu-
ment here; in view of our disposition, we do not reach it. The Court of
Appeal noted that appellants did not challenge California's tax on due
process grounds. See 132 Cal. Rptr., at 532 n. 2. Although appellants
proffer a due process challenge here, we need not reach it either.

[4] The California Supreme Court also rejected appellants' argument that
California's tax constituted "Imposts or Duties" proscribed by U. S.
Const., Art. I, § 10, cl. 2. 20 Cal. 3d, at 186–188, 571 P. 2d, at 258–259.
Appellants reiterate this argument here; in view of our disposition, we do

Appellants appealed. We postponed consideration of our jurisdiction to the hearing on the merits. 436 U. S. 955 (1978).

## II

This Court has appellate jurisdiction to review a final judgment rendered by the highest court of a State in which a decision could be had "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." 28 U. S. C. § 1257 (2). In this case, appellants drew in question the validity of California's ad valorem property tax, contending that the tax, as applied to their containers, was repugnant to the Commerce Clause and various treaties, and the California Supreme Court sustained the validity of the tax. Under these circumstances, this Court's appellate jurisdiction would seem manifest.

Appellees suggest that the California courts did not in reality uphold the tax statute against constitutional attack, but simply refused to extend to appellants a constitutional immunity from taxation. Motion to Dismiss or Affirm 2. Appellees' suggested recharacterization is unpersuasive. Appellants squarely challenged the constitutionality of the tax

---

not consider it. In their petition for rehearing, appellants argued that the tax contravened Art. III, §§ 1 and 2 of the General Agreement on Tariffs and Trade (GATT), 61 Stat. A18 (providing that "imported products" may not be subjected to heavier taxes, or to less favorable treatment, than like products of domestic origin). Pet. for Rehearing 35–40. The court rejected this latter argument *sub silentio*. 20 Cal. 3d, at 190. Appellants repeat this argument here, and we deem it frivolous. Assuming, *arguendo*, that appellants' containers, as instrumentalities of commerce entering this country subject to re-exportation, could be labeled "imported products" within the meaning of GATT, the provisions on which appellants rely prohibit only *discriminatory* treatment. As noted in n. 3, *supra*, there is no evidence that California has treated Japanese containers differently from domestic containers for purposes of applying its property tax.

statute, as applied, and the California Supreme Court just as squarely sustained its validity, as applied. We have held consistently that a state statute is sustained within the meaning of § 1257 (2) when a state court holds it applicable to a particular set of facts as against the contention that such application is invalid on federal grounds. *E. g., Cohen* v. *California,* 403 U. S. 15, 17–18 (1971); *Warren Trading Post* v. *Arizona Tax Comm'n,* 380 U. S. 685, 686, and n. 1 (1965); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 61 n. 3 (1963); *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 288–290 (1921). We conclude that we have appellate jurisdiction of this case.

### III

### A

The "home port doctrine" was first alluded to in *Hays* v. *Pacific Mail S. S. Co.,* 17 How. 596 (1855). In *Hays,* California sought to impose property taxes on oceangoing vessels intermittently touching its ports. The vessels' home port was New York City, where they were owned, registered, and based; they engaged in intercoastal commerce by way of the Isthmus of Panama, and remained in California briefly to unload cargo and undergo repairs. This Court held that the ships had established no tax situs in California:

> "We are satisfied that the State of California had no jurisdiction over these vessels for the purpose of taxation; they were not, properly, abiding within its limits, so as to become incorporated with the other personal property of the State; they were there but temporarily, engaged in lawful trade and commerce, with their *situs* at the home port, where the vessels belonged, and where the owners were liable to be taxed for the capital invested, and where the taxes had been paid." *Id.,* at 599–600.

Because the vessels were properly taxable in their home port,

this Court concluded, they could not be taxed in California at all.[5]

The "home port doctrine" enunciated in *Hays* was a corollary of the medieval maxim *mobilia sequuntur personam* ("movables follow the person," see Black's Law Dictionary 1154 (rev. 4th ed. 1968)) and resulted in personal property being taxable in full at the domicile of the owner. This theory of taxation, of course, has fallen into desuetude, and the "home port doctrine," as a rule for taxation of moving equipment, has yielded to a rule of fair apportionment among the States. This Court, accordingly, has held that various instrumentalities of commerce may be taxed, on a properly apportioned basis, by the nondomiciliary States through which they travel. *E. g., Pullman's Palace Car Co. v. Pennsylvania,* 141 U. S. 18 (1891); *Ott v. Mississippi Valley Barge Line Co.,* 336 U. S. 169 (1949); *Braniff Airways, Inc. v. Nebraska State Bd. of Equalization,* 347 U. S. 590 (1954). In discarding the "home port" theory for the theory of apportionment, however, the Court consistently has distinguished the case of oceangoing vessels. *E. g., Pullman's Palace,* 141 U. S., at 23–24 (approving apportioned tax on railroad rolling stock, but distinguishing vessels "engaged in interstate or foreign commerce upon the high seas"); *Ott,* 336 U. S., at 173–174 (approving apportioned tax on barges navigating inland waterways, but "not reach[ing] the question of taxability of ocean carriage"); *Braniff,* 347 U. S., at 600 (approving apportioned tax on domestic aircraft, but distinguishing vessels "used to plow the open seas"). Relying on these cases, appellants argue that the "home port doctrine," yet vital, continues to prescribe the proper rule for state taxation of oceangoing ships. Since

---

[5] The "home port doctrine" was reaffirmed, as to oceangoing vessels, in *Morgan v. Parham,* 16 Wall. 471, 476–477 (1873), and in *Southern Pacific Co. v. Kentucky,* 222 U. S. 63, 69 (1911). It was applied to vessels moving in inland waters in *St. Louis v. Ferry Co.,* 11 Wall. 423 (1871), and in *Ayer & Lord Tie Co. v. Kentucky,* 202 U. S. 409, 421–423 (1906).

containers are "functionally a part of the ship," *Leather's Best, Inc.* v. *S. S. Mormaclynx,* 451 F. 2d 800, 815 (CA2 1971), appellants conclude, the containers, like the ships, may be taxed only at their home ports in Japan, and thus are immune from tax in California.

Although appellants' argument, as will be seen below, has an inner logic, we decline to cast our analysis of the present case in this mold. The "home port doctrine" can claim no unequivocal constitutional source; in assessing the legitimacy of California's tax, the *Hays* Court did not rely on the Commerce Clause, nor could it, in 1854, have relied on the Due Process Clause of the Fourteenth Amendment. The basis of the "home port doctrine," rather, was common-law jurisdiction to tax.[6] Given its origins, the doctrine could be said to be "anachronistic"; given its underpinnings, it may indeed be said to have been "abandoned." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 320 (1944) (Stone, C. J., dissenting). As a theoretical matter, then, to rehabilitate the "home port doctrine" as a tool of Commerce Clause analysis would be somewhat odd. More importantly, to hold in this case that the "home port doctrine" survives would be to prove too much. If an oceangoing vessel could indeed be taxed only at its home port, taxation by a nondomiciliary State logically would be barred, regardless of whether the vessel were domestically or foreign owned, and regardless of whether it were engaged in domestic or foreign commerce. In *Hays* itself, the vessel was owned in New York and was engaged in interstate commerce through international waters. There is no need in this case to decide currently the broad proposition whether mere use of international routes is enough, under the "home port doctrine," to render an instrumentality im-

---

[6] See, *e. g.,* Note, 49 Calif. L. Rev. 968, 970–971 (1961); Note, State Taxation of International Air Transportation, 11 Stan. L. Rev. 518, 522, and n. 19 (1959); Page, Jurisdiction to Tax Tangible Movables, 1945 Wis. L. Rev. 125, 143–144.

mune from tax in a nondomiciliary State. The question here is a much more narrow one, that is, whether instrumentalities of commerce that are owned, based, and registered abroad and that are used exclusively in international commerce, may be subjected to apportioned ad valorem property taxation by a State.[7]

## B

The Constitution provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. In construing Congress' power to "regulate Commerce . . . among the several States," the Court recently has affirmed that the Constitution confers no immunity from state taxation, and that "interstate commerce must bear its fair share of the state tax burden." *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 750 (1978). Instrumentalities of interstate commerce are no exception to this rule, and the Court regularly has sustained property taxes as applied to various forms of transportation equipment. See *Pullman's Palace, supra* (railroad rolling stock); *Ott, supra* (barges on inland waterways); *Braniff, supra* (domestic aircraft). Cf. *Central Greyhound Lines* v. *Mealey*, 334 U. S. 653, 663 (1948) (motor vehicles). If the state tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the

---

[7] Accordingly, we do not reach questions as to the taxability of foreign-owned instrumentalities engaged in interstate commerce, or of domestically owned instrumentalities engaged in foreign commerce. Cf. *Sea-Land Service, Inc.* v. *County of Alameda*, 12 Cal. 3d 772, 528 P. 2d 56 (1974) (domestically owned containers used in intercoastal and foreign commerce held subject to apportioned property tax); *Flying Tiger Line, Inc.* v. *County of Los Angeles*, 51 Cal. 2d 314, 333 P. 2d 323 (1958) (domestically owned aircraft used in foreign commerce held subject to apportioned property tax).

services provided by the State," no impermissible burden on interstate commerce will be found. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977); *Washington Revenue Dept.,* 435 U. S., at 750.

Appellees contend that cargo shipping containers, like other vehicles of commercial transport, are subject to property taxation, and that the taxes imposed here meet *Complete Auto's* fourfold requirements. The containers, they argue, have a "substantial nexus" with California because some of them are present in that State at all times; jurisdiction to tax is based on "the habitual employment of the property within the State," *Braniff,* 347 U. S., at 601, and appellants' containers habitually are so employed. The tax, moreover, is "fairly apportioned," since it is levied only on the containers' "average presence" in California.[8] The tax "does not discriminate," thirdly, since it falls evenhandedly on all personal property in the State; indeed, as an ad valorem tax of general application, it is of necessity nondiscriminatory. The tax, finally, is "fairly related to the services provided by" California, services that include not only police and fire protection, but also the benefits of a trained work force and the advantages of a civilized society.

These observations are not without force. We may assume that, if the containers at issue here were instrumentalities of purely interstate commerce, *Complete Auto* would apply and be satisfied, and our Commerce Clause inquiry would be at an end. Appellants' containers, however, are instrumentalities of

---

[8] By taxing property present on the "lien date," California roughly apportions its property tax for mobile goods like containers. For example, if each of appellants' containers is in California for three weeks a year, the number present on any arbitrarily selected date would be roughly $\frac{3}{52}$ of the total entering the State that year. Taxing $\frac{3}{52}$ of the containers at full value, however, is the same as taxing all the containers at $\frac{3}{52}$ value. Thus, California effectively apportions its tax to reflect the containers' "average presence," *i. e.,* the time each container spends in the State per year.

foreign commerce, both as a matter of fact [9] and as a matter of law.[10] The premise of appellees' argument is that the Commerce Clause analysis is identical, regardless of whether interstate or foreign commerce is involved. This premise, we have concluded, must be rejected. When construing Congress' power to "regulate Commerce with foreign Nations," a more extensive constitutional inquiry is required.

When a State seeks to tax the instrumentalities of foreign commerce, two additional considerations, beyond those articulated in *Complete Auto*, come into play. The first is the enhanced risk of multiple taxation. It is a commonplace of constitutional jurisprudence that multiple taxation may well be offensive to the Commerce Clause. *E. g., Evco* v. *Jones*, 409 U. S. 91, 94 (1972); *Central R. Co.* v. *Pennsylvania*, 370 U. S. 607, 612 (1962); *Standard Oil Co.* v. *Peck*, 342 U. S. 382, 384–385 (1952); *Ott*, 336 U. S., at 174; *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 311 (1938). In order to prevent

---

[9] As noted above, the trial court found that appellants' containers are "instrumentalities of foreign commerce" that are "used constantly and exclusively for the transportation of cargo for hire in foreign commerce." App. 35, 36.

[10] Appellants' containers entered the United States pursuant to the Customs Convention on Containers, see n. 1, *supra*, which grants containers "temporary admission free of import duties and import taxes and free of import prohibitions and restrictions," provided they are used solely in foreign commerce and are subject to re-exportation. 20 U. S. T., at 304. Similarly, 19 CFR § 10.41a (a)(3) (1978) designates containers "instruments of international traffic," with the result that they "may be released without entry or the payment of duty" under 19 U. S. C. § 1322 (a). See 19 CFR § 10.41a (a)(1) (1978). A bilateral tax Convention between Japan and the United States associates containers with the vehicles that carry them, and provides that income "derived by a resident of a Contracting State . . . from the use, maintenance, and lease of containers and related equipment . . . in connection with the operation in international traffic of ships or aircraft . . . is exempt from tax in the other Contracting State." Convention Between the United States of America and Japan for the Avoidance of Double Taxation, Mar. 8, 1971, [1972] 23 U. S. T. 967, 1084–1085, T. I. A. S. No. 7365.

multiple taxation of interstate commerce, this Court has required that taxes be apportioned among taxing jurisdictions, so that no instrumentality of commerce is subjected to more than one tax on its full value. The corollary of the apportionment principle, of course, is that no jurisdiction may tax the instrumentality in full. "The rule which permits taxation by two or more states on an apportionment basis precludes taxation of all of the property by the state of the domicile. . . . Otherwise there would be multiple taxation of interstate operations." *Standard Oil Co.* v. *Peck,* 342 U. S., at 384–385; *Braniff,* 347 U. S., at 601. The basis for this Court's approval of apportioned property taxation, in other words, has been its ability to enforce full apportionment by all potential taxing bodies.

Yet neither this Court nor this Nation can ensure full apportionment when one of the taxing entities is a foreign sovereign. If an instrumentality of commerce is domiciled abroad, the country of domicile may have the right, consistently with the custom of nations, to impose a tax on its full value.[11] If a State should seek to tax the same instrumentality on an apportioned basis, multiple taxation inevitably results. Hence, whereas the fact of apportionment in interstate commerce means that "multiple burdens logically cannot occur," *Washington Revenue Dept.,* 435 U. S., at 746–747, the same conclusion, as to foreign commerce, logically cannot be drawn. Due to the absence of an authoritative tribunal capable of ensuring that the aggregation of taxes is computed

---

[11] Oceangoing vessels, for example, are generally taxed only in their nation of registry; this fact in part explains the phenomenon of "flags of convenience" (a term deemed derogatory in some quarters), whereby vessels are registered under the flags of countries that permit the operation of ships "at a nominal level of taxation." See B. Boczek, Flags of Convenience 5, 56–57 (1962). Aircraft engaged in international traffic, apparently, are likewise "subject to taxation on an unapportioned basis by their country of origin." Note, 11 Stan. L. Rev., *supra* n. 6, at 519, and n. 11. See, *e. g., SAS,* 56 Cal. 3d, at 17, and n. 3, 363 P. 2d, at 28, and n. 3.

on no more than one full value, a state tax, even though "fairly apportioned" to reflect an instrumentality's presence within the State, may subject foreign commerce " 'to the risk of a double tax burden to which ·[domestic] commerce is not exposed, and which the commerce clause forbids.' " *Evco* v. *Jones,* 409 U. S., at 94, quoting *J. D. Adams Mfg. Co.,* 304 U. S., at 311.

Second, a state tax on the instrumentalities of foreign commerce may impair federal uniformity in an area where federal uniformity is essential. Foreign commerce is pre-eminently a matter of national concern. "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Board of Trustees* v. *United States,* 289 U. S. 48, 59 (1933). Although the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce "with foreign Nations" and "among the several States" in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.[12] Cases of this Court, stressing the need for uniformity in treating with other nations, echo this distinction.[13] In approving state taxes on the instrumentalities

[12] *E. g.,* The Federalist No. 42, pp. 279–283 (J. Cooke ed. 1961) (Madison); 3 M. Farrand, The Records of the Federal Convention of 1787, p. 478 (1911) (Madison). See Note, State Taxation of International Air Carriers, 57 Nw. U. L. Rev. 92, 101, and n. 42 (1962); Note, 11 Stan. L. Rev., *supra* n. 6, at 525–526, and n. 29; Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 465–475 (1941) (concluding, after an exhaustive survey of contemporary materials: "Despite the formal parallelism of the grants, there is no tenable reason for believing that anywhere nearly so large a range of action was given over commerce 'among the several states' as over that 'with foreign nations.' " *Id.,* at 475).

[13] *E. g., Buttfield* v. *Stranahan,* 192 U. S. 470, 492–493 (1904) ("exclusive and absolute" power of Congress over foreign commerce); *Bowman* v. *Chicago & N. R. Co.,* 125 U. S. 465, 482 (1888) ("It may be argued [that] the inference to be drawn from the absence of legislation by Con-

of interstate commerce, the Court consistently has distinguished oceangoing traffic, *supra,* at 442; these cases reflect an awareness that the taxation of foreign commerce may necessitate a uniform national rule. Indeed, in *Pullman's Palace,* the Court wrote that the " 'vehicles of commerce by water being instruments of intercommunication with other nations, the regulation of them is assumed by the national legislature.' " 141 U. S., at 24, quoting *Railroad Co.* v. *Maryland,* 21 Wall. 456, 470 (1875). Finally, in discussing the Import-Export Clause, this Court, in *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 285 (1976), spoke of the Framers' overriding concern that "the Federal Government must speak with one voice when regulating commercial relations with foreign governments." The need for federal uniformity is no less paramount in ascertaining the negative implications of Congress' power to "regulate Commerce with foreign Nations" under the Commerce Clause.[14]

---

gress on the subject excludes state legislation affecting commerce with foreign nations more strongly than that affecting commerce among the States. Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation") ; *Henderson* v. *Mayor of New York,* 92 U. S. 259, 273 (1876) (regulation "must of necessity be national in its character" when it affects "a subject which concerns our international relations, in regard to which foreign nations ought to be considered and their rights respected") ; *Gibbons* v. *Ogden,* 9 Wheat. 1, 228–229 (1824) (Johnson, J., concurring). See also *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 434 (1932). In *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), the Court noted that Congress' power to regulate interstate commerce may be restricted by considerations of federalism and state sovereignty. It has never been suggested that Congress' power to regulate foreign commerce could be so limited.

[14] The policies animating the Import-Export Clause and the Commerce Clause are much the same. In *Michelin,* the Court noted that the Import-Export Clause met three main concerns: "[T]he Federal Government must speak with one voice when regulating commercial relations with foreign governments . . . ; import revenues were to be the major source of revenue

A state tax on instrumentalities of foreign commerce may frustrate the achievement of federal uniformity in several ways. If the State imposes an apportioned tax, international disputes over reconciling apportionment formulae may arise.[15] If a novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged by the levy may retaliate against American-owned instrumentalities present in their jurisdictions. Such retaliation of necessity would be directed at American transportation equipment in general, not just that of the taxing State, so that the Nation as a whole would suffer.[16] If other States followed the taxing State's

---

of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States . . . were prohibited from levying taxes on [goods in transit]." 423 U. S., at 285–286 (footnotes omitted). Abel, see n. 12, supra, observed that the Commerce Clause was directed to similar concerns. See 25 Minn. L. Rev., at 448, and n. 67, 452, and n. 81, 456–457, and n. 110 (need to deal in unified manner with foreign nations); id., at 446–451 (need to preserve federal revenue); id., at 448–449, and nn. 69–70, 470–471, 472–473 (need to prevent disharmony among States on account of import duties). In *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734 (1978), we noted that the third *Michelin* factor—preserving harmony among the States—mandated the same inquiry as to the effect of a state tax as the Interstate Commerce Clause. See id., at 754–755. In this case, similarly, the first *Michelin* factor—the need to speak with one voice when regulating commercial relations with foreign governments—mandates the same inquiry as to the effect of a state tax as the Foreign Commerce Clause. In *Washington Revenue Dept.*, the Court, holding that the state tax at issue did not prevent "speaking with one voice," noted: "No foreign business or vessel is taxed." 435 U. S., at 754.

[15] See Note, Developments in the Law—Federal Limitations on State Taxation of Interstate Business, 75 Harv. L. Rev. 953, 986 (1962) (noting the difficulty of allocating "international bridge time" for aircraft engaged in international commerce, with consequent risk of multiple taxation from overlapping apportionment formulae, and concluding that apportioned state taxation of foreign-owned aircraft should be forbidden).

[16] Cf. *Chy Lung* v. *Freeman*, 92 U. S. 275, 279 (1876) (invalidating California's bond requirement for Chinese immigrants):

"[I]f this plaintiff and her twenty companions had been subjects of the

example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from "speaking with one voice" in regulating foreign commerce.

For these reasons, we believe that an inquiry more elaborate than that mandated by *Complete Auto* is necessary when a State seeks to tax the instrumentalities of foreign, rather than of interstate, commerce. In addition to answering the nexus, apportionment, and nondiscrimination questions posed in *Complete Auto,* a court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from "speaking with one voice when regulating commercial relations with foreign governments." If a state tax contravenes either of these precepts, it is unconstitutional under the Commerce Clause.

## C

Analysis of California's tax under these principles dictates that the tax, as applied to appellants' containers, is impermissible. Assuming, *arguendo,* that the tax passes muster under *Complete Auto,* it cannot withstand scrutiny under either of the additional tests that a tax on foreign commerce must satisfy.

First, California's tax results in multiple taxation of the instrumentalities of foreign commerce. By stipulation, appellants' containers are owned, based, and registered in Japan; they are used exclusively in international commerce; and they

Queen of Great Britain, can any one doubt that this matter would have been the subject of international inquiry, if not of a direct claim for redress? Upon whom would such a claim be made? Not upon the State of California; for, by our Constitution, she can hold no exterior relations with other nations. It would be made upon the government of the United States. If that government should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"

remain outside Japan only so long as needed to complete their international missions. Under these circumstances, Japan has the right and the power to tax the containers in full. California's tax, however, creates more than the *risk* of multiple taxation; it produces multiple taxation in fact. Appellants' containers not only "are subject to property tax . . . in Japan," App. 32, but, as the trial court found, "are, in fact, taxed in Japan." *Id.*, at 35. Thus, if appellees' levies were sustained, appellants "would be paying a double tax." *Id.*, at 23.[17]

Second, California's tax prevents this Nation from "speaking with one voice" in regulating foreign trade. The desirability of uniform treatment of containers used exclusively in foreign commerce is evidenced by the Customs Convention on Containers, which the United States and Japan have signed. See

---

[17] The stipulation of facts, App. 32, like the trial court's finding, *id.*, at 35, states that "[a]ll containers of [appellants] are subject to property tax and are, in fact, taxed in Japan." The record does not further elaborate on the nature of Japan's property tax. Appellants have uniformly insisted, Brief 9; Tr. of Oral Arg. 3, that Japan's property tax is unapportioned, *i. e.*, that it is imposed on the containers' full value, and we so understand the trial court's finding. Although appellees do not seriously challenge this understanding, Brief 10–11, and n. 2, *amicus curiae* Multistate Tax Commission suggests that the record is inadequate to establish double taxation in fact: Japan, *amicus* says, may offer "credits . . . for taxes paid elsewhere." Brief 8. *Amicus* provides no evidence to support this theory. Both the Solicitor General, Brief for United States as *Amicus Curiae* 19 n. 9, and the Department of State, *id.*, at 17a, assure us that Japan taxes appellants' containers at their "full value," and we accept this interpretation of the trial court's factual finding.

Because California's tax in this case creates multiple taxation in fact, we have no occasion here to decide under what circumstances the mere *risk* of multiple taxation would invalidate a state tax, or whether this risk would be evaluated differently in foreign, as opposed to interstate, commerce. Compare *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 276–277 (1978), and *Washington Revenue Dept.*, 435 U. S., at 746, with, *e. g.*, *Central R. Co.* v. *Pennsylvania*, 370 U. S. 607, 615 (1962); *Ott* v. *Mississippi Barge Line Co.*, 336 U. S. 169, 175 (1949); and *Northwest Airlines, Inc.* v. *Minnesota*, 322 U. S. 292, 326 (1944) (Stone, C. J., dissenting).

n. 10, *supra*.   Under this Convention, containers temporarily imported are admitted free of "all duties and taxes whatsoever chargeable by reason of importation."   20 U. S. T., at 304. The Convention reflects a national policy to remove impediments to the use of containers as "ir struments of international traffic."   19 U. S. C. § 1322 (a).   California's tax, however, will frustrate attainment of federal uniformity.   It is stipulated that American-owned containers are not taxed in Japan. App. 35.   California's tax thus creates an asymmetry in international maritime taxation operating to Japan's disadvantage. The risk of retaliation by Japan, under these circumstances, is acute, and such retaliation of necessity would be felt by the Nation as a whole.[18]   If other States follow California's example (Oregon already has done so [19]), foreign-owned containers will be subjected to various degrees of multiple taxation, depending on which American ports they enter.   This result, obviously, would make "speaking with one voice" impossible. California, by its unilateral act, cannot be permitted to place these impediments before this Nation's conduct of its foreign relations and its foreign trade.

Because California's ad valorem tax, as applied to appellants' containers, results in multiple taxation of the instrumentalities of foreign commerce, and because it prevents the Federal Government from "speaking with one voice" in international trade, the tax is inconsistent with Congress' power to "regulate

---

[18] Retaliation by some nations could be automatic.   West Germany's wealth tax statute, for example, provides an exemption for foreign-owned instrumentalities of commerce, but only if the owner's country grants a reciprocal exemption for German-owned instrumentalities.   Vermögensteuergesetz (VStG), Art. 1, § 2 (3), reprinted in I Bundesgesetzblatt (BGB1) 950 (Apr. 23, 1974).   The European Economic Community (EEC), when apprised of California's tax on foreign-owned containers, apparently determined to consider "suitable counter-measures."   Press Release, Council of the European Communities, 521st Council Meeting— Transport (Luxembourg, June 12, 1978), p. 21.

[19] Ore. Op. Atty. Gen. No. 7709 (Jan. 31, 1979) (citing decision below).

Commerce with foreign Nations." We hold the tax, as applied, unconstitutional under the Commerce Clause.

## D

Appellees proffer several objections to this holding. They contend, first, that any multiple taxation in this case is attributable, not to California, but to Japan. California, they say, is just trying to take its share; it should not be foreclosed by Japan's election to tax the containers in full. California's tax, however, must be evaluated in the realistic framework of the custom of nations. Japan has the right and the power to tax appellants' containers at their full value; nothing could prevent it from doing so. Appellees' argument may have force in the interstate commerce context. Cf. *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267, 277, and n. 12 (1978). In interstate commerce, if the domiciliary State is "to blame" for exacting an excessive tax, this Court is able to insist upon rationalization of the apportionment. As noted above, however, this Court is powerless to correct malapportionment of taxes imposed from abroad in foreign commerce.

Appellees contend, secondly, that any multiple taxation created by California's tax can be cured by congressional action or by international agreement. We find no merit in this contention. The premise of appellees' argument is that a State is free to impose demonstrable burdens on commerce, so long as Congress has not pre-empted the field by affirmative regulation. But it long has been "accepted constitutional doctrine that the commerce clause, without the aid of Congressional legislation . . . affords some protection from state legislation inimical to the national commerce, and that in such cases, where Congress has not acted, this Court, and not the state legislature, is under the commerce clause the final arbiter of the competing demands of state and national interests." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945). Accord, *Hughes* v. *Oklahoma, ante,* at

326, and n. 2; *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 328 (1977). Appellees' argument, moreover, defeats, rather than supports, the cause it aims to promote. For to say that California has created a problem susceptible only of congressional—indeed, only of international—solution is to concede that the taxation of foreign-owned containers is an area where a uniform federal rule is essential. California may not tell this Nation or Japan how to run their foreign policies.

Third, appellees argue that, even if California's tax results in multiple taxation, that fact, after *Moorman,* is insufficient to condemn a state tax under the Commerce Clause. In *Moorman,* the Court refused to invalidate Iowa's single-factor income tax apportionment formula, even though it posed a credible threat of overlapping taxation because of the use of three-factor formulae by other States. See also the several opinions in *Moorman* in dissent. 437 U. S., at 281, 282, and 283. That case, however, is quite different from this one. In *Moorman,* the existence of multiple taxation, on the record then before the Court, was "speculative," *id.,* at 276; on the record of the present case, multiple taxation is a fact. In *Moorman,* the problem arose, not from lack of apportionment, but from mathematical imprecision in apportionment formulae. Yet, this Court consistently had held that the Commerce Clause "does not call for mathematical exactness nor for the rigid application of a particular formula; only if the resulting valuation is palpably excessive will it be set aside." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S., at 325 (Stone, C. J., dissenting). Accord, *Moorman,* 437 U. S., at 274 (citing cases). See Hellerstein, State Taxation Under the Commerce Clause: An Historical Perspective, 29 Vand. L. Rev. 335, 347 (1976). This case, by contrast, involves no mere mathematical imprecision in apportionment; it involves a situation where true apportionment does not exist and cannot be policed by this Court at all. *Moorman,* finally, concerned

interstate commerce. This case concerns foreign commerce. Even a slight overlapping of tax—a problem that might be deemed *de minimis* in a domestic context—assumes importance when sensitive matters of foreign relations and national sovereignty are concerned.[20]

Finally, appellees present policy arguments. If California cannot tax appellants' containers, they complain, the State will lose revenue, even though the containers plainly have a nexus with California; the State will go uncompensated for the services it undeniably renders the containers; and, by

---

[20] Appellees' reliance on *Bob-Lo Excursion Co.* v. *Michigan*, 333 U. S. 28 (1948), is also misplaced. In that case, the appellant, a Michigan corporation, transported passengers from Detroit to an amusement park on an island in the Province of Ontario; the appellant refused to accept Negro passengers and was prosecuted under a Michigan civil rights statute. In sustaining the statute's application against Commerce Clause attack, the Court emphasized that the appellant conducted "foreign commerce" in name only. The sole business on the island was the amusement park, and it catered solely to American patrons. There were "no established means of access from the Canadian shore to the island," *id.*, at 36, and the island was "economically and socially . . . an amusement adjunct of the city of Detroit." *Id.*, at 35. The "highly closed and localized manner" in which the business was run insulated it "from all commercial or social intercourse and traffic with the people of another country usually characteristic of foreign commerce." *Id.*, at 36. The Court noted that the possibility of conflicting Canadian regulation was "so remote that it [was] hardly more than conceivable," *id.*, at 37, and concluded that, on the facts of the case, it was "difficult to imagine what national interest or policy, whether of securing uniformity in regulating commerce affecting relations with foreign nations or otherwise, could reasonably be found to be adversely affected by applying Michigan's statute to these facts or to outweigh her interest in doing so." *Id.*, at 40.

*Bob-Lo* is consistent with both the analysis and the result in the present case. Whereas in *Bob-Lo* the risk that foreign commerce would be burdened by inconsistent international regulation was "remote," the risk that foreign commerce will be burdened by international multiple taxation here has been realized in fact. And whereas the Michigan statute posed no threat at all to the Federal Government's ability to "speak with one voice" in regulating foreign trade, the impairment of federal uniformity worked by California's statute is substantial.

exempting appellants' containers from tax, the State in effect will be forced to discriminate against domestic, in favor of foreign, commerce. These arguments are not without weight, and, to the extent appellees cannot recoup the value of their services through user fees, they may indeed be disadvantaged by our decision today. These arguments, however, are directed to the wrong forum. "Whatever subjects of this [the commercial] power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." *Cooley* v. *Board of Wardens,* 12 How. 299, 319 (1852). The problems to which appellees refer are problems that admit only of a federal remedy. They do not admit of a unilateral solution by a State.

The judgment of the Supreme Court of California is reversed.

*It is so ordered.*

Substantially for the reasons set forth by Justice Manuel in his opinion for the unanimous Supreme Court of California, 20 Cal. 3d 180, 571 P. 2d 254, MR. JUSTICE REHNQUIST is of the opinion that the judgment of that court should be affirmed.