894 So.2d 954 (2005)
FLORIDA DEPARTMENT OF REVENUE, Petitioner,
v.
NEW SEA ESCAPE CRUISES, LTD., Respondent.
No. SC02-2013.
Supreme Court of Florida.
February 17, 2005.
*955 Charles J. Crist, Jr., Attorney General, Nicholas Bykowsky and Martha F. Barrera, Assistant Attorneys General, Tallahassee, FL, for Petitioner.
*956 Edna L. Caruso of Caruso and Burlington, P.A., West Palm Beach, FL, for Respondent.
Kenneth M. Hart of Gunster, Yoakley and Stewart, P.A. on behalf of Deerbrooke Investments, Inc., for Amicus Curiae.
LEWIS, J.
We have for review New Sea Escape Cruises, Ltd. v. Florida Department of Revenue, 823 So.2d 161 (Fla. 4th DCA 2002), which expressly and directly conflicts with the decision in Dream Boat, Inc. v. Department of Revenue, 28 Fla. L. Weekly D837, ___ So.2d ___, 2003 WL 1560175 (Fla. 1st DCA Mar.27, 2003), notice invoking discretionary review filed, No. SC03-637 (Fla. Apr. 9, 2003). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons stated herein, we approve the decision below and disapprove the district court's decision in Dream Boat.

BACKGROUND AND FACTS
New Sea Escape is a Bahamian company which operates as a foreign flag vessel and maintains its corporate headquarters in Fort Lauderdale. The company is registered with the Department of Revenue as a "Florida dealer" for sales and use tax purposes. New Sea Escape operates "cruises to nowhere" on a vessel that departs Fort Lauderdale, cruises to a distance of three miles off the coast of Florida to conduct gambling operations, and returns to Fort Lauderdale. The vessel cruises on other occasions to Freeport, Bahamas.
Pursuant to section 212.05 of the Florida Statutes, the Florida Department of Revenue (DOR) assessed use taxes against the respondent for proceeds from a gambling concession agreement, the gambling equipment on the vessel, and proceeds from a food concession agreement incurred for a period from September 1, 1996, to April 30, 1998. According to a Notice of Reconsideration issued by the DOR on October 4, 2000, the respondent owed $1,343,925.33 in taxes, penalties, and interest.[1]
At issue in the proceedings before the DOR was what portion of the mileage traveled by the ship would be factored into the sales and use tax apportionment formula provided under section 212.08(8) of the Florida Statutes for vessels engaged in interstate or foreign commerce. The DOR and New Sea Escape had agreed upon a methodology for calculating the tax owed, which consisted of analyzing the vessel's operations and total miles traveled during a test period to arrive at a percentage of total miles traveled within Florida's territorial waters.
The ship's log revealed that the vessel traveled a total of 867.7 miles over the test period, encompassing both its voyages to the Bahamas and its cruises-to-nowhere, only 40 miles of which were traveled within Florida's territorial waters.[2] Thus, New Sea Escape's calculation of the ratio of Florida miles to total miles traveled yielded an allocation factor of roughly 4.5 percent. The DOR disagreed, determining that cruise-to-nowhere operations do not qualify as "transportation in foreign commerce" and, therefore, do not come within the purview of the partial exemption under section 212.08(8). For that reason, the *957 DOR included all of the miles traveled during cruise-to-nowhere operations in the numerator of the apportionment formula, resulting in an allocation factor of 31.7 percent.
Respondent appealed to the Fourth District Court of Appeal, arguing, in pertinent part, that because the vessel was not in Florida waters when the gambling occurred, the taxes must be prorated under section 212.08(8)(a) of the Florida Statutes to account for the foreign mileage traveled by the vessel. The district court agreed, reasoning that any activity occurring when the vessel was located more than three miles off the coast of Florida, and thus outside the boundaries of the state, could not be taxed as if it occurred in Florida. Based on this reasoning, the district court held that New Sea Escape's taxes must be prorated under section 212.08(8). The district court also determined that while the gambling equipment and gambling concession on the vessel were taxable on a prorated basis, the food and beverage concessions were not taxable to any extent.[3]
In rendering its decision, the Fourth District rejected the DOR's position that New Sea Escape did not qualify for the partial tax exemption because the vessel did not stop in a foreign port. Labeling this position a "distinction without a difference," the district court stated, "When the vessel is cruising outside Florida's waters, those miles cannot constitute `Florida mileage' under the proration statute, section 212.08(8)." New Sea Escape, 823 So.2d at 163.
This Court granted review to resolve the express and direct conflict between the Fourth District's decision and the decision in Dream Boat, Inc. v. Department of Revenue, 28 Fla. L. Weekly D837, ___ So.2d ___, 2003 WL 1560175 (Fla. 1st DCA Mar.27, 2003). See Fla. Dep't of Revenue v. New Sea Escape Cruises, Ltd., 845 So.2d 889 (Fla.2003) (table). In Dream Boat, the district court determined that cruises-to-nowhere that do not leave U.S. territorial waters cannot be engaged in foreign commerce. Since this Court's grant of review, the Fourth District has issued another decision requiring the proration of sales and use taxes for Deerbrooke Investments, Inc., a Panamanian corporation that operated a gaming ship off the coast of Florida during 1997 and 1998. See Deerbrooke Invs., Inc. v. Fla. Dep't of Revenue, 861 So.2d 447 (Fla. 4th DCA 2003).

ANALYSIS
The instant case involves the interpretation of Florida's sales and use tax statute and is thus a legal matter subject to a de novo standard of review. See Racetrac Petroleum, Inc. v. Delco Oil, Inc., 721 So.2d 376, 378 (Fla. 5th DCA 1998). Our deliberations regarding the scope, meaning, and application of Florida law are guided by certain time-tested principles. As this Court has consistently determined, "Legislative intent is the polestar by which a court must be guided in interpreting the provisions of a law. In ascertaining the legislative intent, a court must consider the plain language of the statute, give effect to all statutory provisions, and construe related provisions in harmony with one another." Hechtman v. Nations Title Ins. of New York, 840 So.2d 993, 996 (Fla.2003) (citation omitted). At issue in the instant matter is whether the Legislature intended for the partial exemption from the state's sales and use tax accorded vessels engaged in foreign or interstate commerce to apply to cruise-to-nowhere *958 operations, during which vessels travel beyond Florida's territorial waters for the purpose of conducting gambling operations.

Application of Florida's Use Tax and New Sea Escape's Commerce Clause Challenge
Florida's sales and use tax statute, found in section 212.05 of the Florida Statutes, permits the assessment of sales or use tax against "every person ... who engages in the business of selling tangible personal property at retail in this state, ... or who stores for use or consumption in this state any item or article of tangible personal property as defined herein and who leases or rents such property within the state." § 212.05, Fla. Stat. (1997). On appeal, New Sea Escape argued that no tax, not even a pro rata amount, should be assessed against the gambling equipment because that equipment is only "used" once the vessel has sailed beyond Florida's territorial waters. The district court correctly rejected this assertion, citing the taxing statute, which broadly defines "use" to include "the exercise of any right or power over tangible personal property incident to the ownership thereof, or interest therein." § 212.02(20), Fla. Stat. (1997). In addition, the district court properly invoked Klosters Rederi A/S v. State Department of Revenue, 348 So.2d 656 (Fla. 3d DCA 1977), where the Third District Court of Appeal determined that the removal from storage and placement of such items as facial tissue, toilet paper, and party supplies on a cruise ship departing from the Port of Miami constituted the taxable "use" of property within the State of Florida.[4]See id. at 658.
As determined by the district court, the interpretation of "use" articulated in Klosters Rederi certainly extends to the instant case where the record demonstrates that the gambling equipment aboard New Sea Escape's vessel is installed, stored, and maintained in Florida, and that money is removed from the machines while the ship is docked in Port Everglades. We approve the district court's determination and reasoning on this point.
Before this Court, New Sea Escape again urges that it is entitled to a complete exemption, asserting that taxation of its cruise-to-nowhere operations violates the Commerce Clause of the United States Constitution under the standard announced in Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979). In Japan Line, the United States Supreme Court articulated a test for determining whether a state regulation affecting foreign commerce violates the Commerce Clause. As a basis for the standard, the Court borrowed the four-prong test set forth in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), for determining the constitutionality of state taxation that affects interstate commerce. The decision in Complete Auto provided that if the state tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State," no impermissible burden on interstate commerce exists. Id. at 279, 97 S.Ct. 1076.
The Court in Japan Line articulated two additional factors for consideration of *959 taxes assessed against instrumentalities engaged in foreign commerce, which include "whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from `speaking with one voice when regulating commercial relations with foreign governments.'" Japan Line, 441 U.S. at 451, 99 S.Ct. 1813 (quoting Michelin Tire Corp. v. Wages, 423 U.S. 276, 285, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976)). The Supreme Court subsequently clarified this prong of the test, determining that "a state tax at variance with federal policy will violate the `one voice' standard if it either implicates foreign policy issues which must be left to the Federal Government or violates a clear federal directive." Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 194, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983).
New Sea Escape contends that Florida's sales and use tax contravenes the Japan Line standard because it subjects the company to risk of multiple taxation and prevents the federal government from addressing the issue of foreign commerce with "one voice." Respondent's argument cannot, however, surmount the material differences between Japan Line and the instant case. Japan Line involved the application of an ad valorem property tax to cargo containers owned by Japanese shipping companies. See 441 U.S. at 436, 99 S.Ct. 1813. The shipping companies were all Japanese corporations with their principal places of business and commercial domiciles in that country, and the vessels used in shipping were registered and had their home ports in Japan. See id. The shipping containers also had their home ports in Japan, and were used "exclusively for hire in the transportation of cargo in foreign commerce." Id. The Supreme Court specifically noted that the containers were "subject to property tax in Japan and, in fact, [were] taxed there." Id. Thus, the issue in Japan Line was "whether instrumentalities of commerce that are owned, based, and registered abroad and that are used exclusively in international commerce, may be subjected to apportioned ad valorem property taxation by a State." Id. at 444, 99 S.Ct. 1813.
In the instant case, the respondent is a Bahamian corporation, but it is registered in the State of Florida as a "dealer" for Florida sales and use tax purposes and maintains its corporate offices in Fort Lauderdale. See New Sea Escape, 823 So.2d at 162. As previously stated, the gambling equipment aboard New Sea Escape's vessel is installed, stored, and maintained while the ship is docked in Florida. While the respondent asserts that multiple taxation is present in the instant case, the company does not profess that it is, or to what extent it is, subject to actual taxation in the Bahamas. New Sea Escape's contention that Florida's sales and use tax results in double taxation and prevents the federal government from speaking with one voice, without more, will not support a finding of a Commerce Clause violation under Japan Line as clarified in Container Corp.
Our conclusion in this regard is bolstered by the fact that taxes were assessed against New Sea Escape on a prorated basis pursuant to section 212.08(8) of the Florida Statutes, which provides that vessels engaged in interstate or foreign commerce are subject to state taxation based on the number of miles traveled within Florida during the taxing year. See § 212.08(8)(a), Fla. Stat. (1997). This Court has specifically upheld the constitutionality of Florida's prorated sales and use tax statute. See Tropical Shipping & Constr. Co. v. Askew, 364 So.2d 433, 436 (Fla.1978). In Tropical Shipping, this Court recognized the balance that must be *960 struck between the obligation to construe tax exemption statutes narrowly and the responsibility to ensure that the construction adheres to constitutional requirements by not "deny[ing] businesses engaged in interstate or foreign commerce their right to be free from undue state interference." Id. at 435. Guided by these principles we determined:
First we note that Florida has the right to tax interstate or foreign commerce to impose "a fair share of the cost of the local government." Freeman v. Hewit, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1947). The United States Supreme Court has upheld the usage of a pro-ration formula to fairly apportion the cost of doing business in the state. Braniff Airways v. Nebraska State Board of Equalization and Assessment, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954). Thus Florida's pro-ration of its sales and use tax is a valid method for insuring that business[es] engaged in interstate and foreign commerce pay their fair share.
Id. at 436.

Application of the Section 212.08(8) Partial Exemption
In the instant matter, we must again balance the requirement to narrowly construe the tax exemption provided under section 212.08(8) of the Florida Statutes against the need to ensure that the State does not exceed its taxing authority. We start the analysis with the text of the sales and use tax statute. As this Court has often repeated, "[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning ... the statute must be given its plain and obvious meaning." A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931).
Section 212.08(8) of the Florida Statutes provides, "The sale or use of vessels and parts thereof used to transport persons or property in interstate or foreign commerce is subject to the taxes imposed in this chapter only to the extent provided herein." § 212.08(8)(a), Fla. Stat. (1997). Pursuant to the final sentence of that subsection, "Vessels and parts thereof used exclusively in intrastate commerce do not qualify for the proration of tax." Id. The DOR has interpreted this statement to mean, "Vessels used in intrastate commerce exclusively within the territorial waters of Florida do not qualify for the partial exemption." Fla. Admin. Code. R. 12A-1.0641(2)(d) (emphasis supplied).
Vessels eligible for the partial tax exemption are taxed based upon the ratio of "intrastate mileage to interstate or foreign mileage traveled by carrier's vessels which were used in interstate or foreign commerce and which had at least some Florida mileage during the previous fiscal year." § 212.08(8)(a), Fla. Stat. (1997) (emphasis supplied). This ratio is then "applied each month to the total Florida purchases of such vessels and parts thereof which are used in Florida to establish that portion of the total used and consumed in intrastate movement and subject to the tax at the applicable rate." Id. (emphasis supplied).
In interpreting those provisions, the district court below concluded that the taxes assessed against New Sea Escape under section 212.05 must be prorated under section 212.08(8). See New Sea Escape, 823 So.2d at 163. In so doing, the district court rejected the DOR's contention that foreign commerce requires stopping in a foreign port,[5] and determined that "[w]hen *961 the vessel is cruising outside Florida's waters, those miles cannot constitute `Florida mileage' under the proration statute, section 212.08(8)." Id. The DOR urges this Court to find error in that reasoning and result, positing instead that New Sea Escape's cruise-to-nowhere operations are "intrastate" in nature. The DOR commends to this Court the analysis employed in Dream Boat, where the district court determined that cruise-to-nowhere vessels are engaged solely in intrastate commerce and thus ineligible for the partial tax exemption. See Dream Boat, 28 Fla. L. Weekly at D838, ___ So.2d at ___.
We cannot, however, approve the reasoning and result reached in Dream Boat and advocated by the DOR in the instant matter, because it rests on the flawed premise that cruise-to-nowhere operations are "intrastate" in nature. As explained in greater detail below, this conclusion contravenes the plain meaning of the term "intrastate commerce" as that phrase qualifies eligibility for the partial exemption, and the phrases "intrastate mileage" and "intrastate movement" as those terms are used in devising the apportionment formula under section 212.08(8). Consequently, the position advanced by the DOR fails to "give effect to all statutory provisions, and construe related provisions in harmony with one another" as this Court is required to do in interpreting Florida law. Hechtman, 840 So.2d at 996.
Complicating the analysis in the instant matter is the fact that the sales and use tax statute does not define the term "intrastate." However, as we have determined,
When a term is undefined by statute, "[o]ne of the most fundamental tenets of statutory construction" requires that we give a statutory term "its plain and ordinary meaning." Green v. State, 604 So.2d 471, 473 (Fla.1992). When necessary, the plain and ordinary meaning "can be ascertained by reference to a dictionary." Id. Further, it is a well-settled rule of statutory construction that in the absence of a statutory definition, courts can resort to definitions of the same term found in case law. See State v. Mitro, 700 So.2d 643, 645 (Fla.1997).
Rollins v. Pizzarelli, 761 So.2d 294, 298 (Fla.2000). The term "intrastate" is commonly construed as meaning "existing or occurring within a state." See Merriam-Webster's Collegiate Dictionary 614 (10th ed.1999). Black's Law Dictionary defines "intrastate commerce" as "Commerce that begins and ends entirely within the borders of a single state." Blacks Law Dictionary 263 (7th ed.1999). We endorsed that definition in a recent case involving the imposition of regulatory assessment fees in the telecommunications industry, determining that the term "intrastate business" means "business occurring within the state of Florida." Level 3 Communications, LLC v. Jacobs, 841 So.2d 447, 451 n. 4 (Fla.2003).
Concluding that "intrastate commerce" means commerce occurring within the state of Florida comports with the language and purpose of the sales and use tax statute. Section 212.05 provides that sales or use taxes can be assessed against "every person... who engages in the business of selling tangible personal property at retail in this state, ... or who stores for use or consumption in this state any item or article of tangible personal property." *962 § 212.05, Fla. Stat. (1997) (emphasis added). The statute defines "in this state" or "in the state" as meaning "within the state boundaries of Florida as defined in s. 1, Art. II of the State Constitution," § 212.02(8), Fla. Stat. (1997). Florida's Constitution provides, for purposes of the instant action, that the state's eastern seaward boundary extends three miles offshore. See art. II, § 1, Fla. Const. (2002); see also State v. Kirvin, 718 So.2d 893, 900 & n. 3. (Fla. 1st DCA 1998); State v. Efthimiadis, 690 So.2d 1320, 1321 (Fla. 4th DCA 1997).[6]
The DOR's attempt to characterize cruise-to-nowhere operations as "intrastate" in nature and label miles traveled outside of Florida's territorial waters during cruises-to-nowhere as "Florida mileage" for the purpose of establishing the portion of taxable consumption occurring within the state ignores the fact that cruises-to-nowhere venture beyond this state's territorial bounds. Under the DOR's interpretation, which aligns with the analysis conducted in Dream Boat, the use of property that occurs once a ship is beyond the state's three-mile seaward boundary can be taxed to the same extent as if the use occurred on land in this state, in one of our ports, or within our three-mile territorial sea.
This interpretation contravenes the plain meaning of the term "intrastate" and fails to give effect to the proration provision, which creates an allocation factor to "establish that portion of the total used and consumed in intrastate movement and subject to the tax at the applicable rate." § 212.08(8)(a), Fla. Stat. (1997) (emphasis supplied); see also Tropical Shipping, 364 So.2d at 435 (stating that a "ratio in which the numerator is the miles traveled in Florida and the denominator is the total miles traveled by the vehicle ... allows Florida to tax the percentage of interstate and foreign commerce activity which occurs within Florida's boundaries"). Interpreting the statute in this manner would also render the provision exempting vessels and parts thereof used exclusively in intrastate commerce meaningless against well-established rules of statutory interpretation. See Hawkins v. Ford Motor Co., 748 So.2d 993, 1000 (Fla.1999). Our charge to narrowly construe tax exemptions against the taxpayer does not require us to turn a blind eye to the fact that consumption occurring outside of the state's borders cannot be "intrastate" in nature.
Furthermore, the interpretation subscribed to by the DOR and the district court in Dream Boat contravenes the general principle of law that a state may not tax interests which are not within its territorial jurisdiction. See Straughn v. Kelly Boat Serv., Inc., 210 So.2d 266, 267 (Fla. 1st DCA 1968) (invalidating taxes imposed on the rental of fishing equipment and sale of food and beverages that occurred when the fishing boat was beyond Florida's territorial limit). This Court has recognized *963 that the purpose of the proration provision of the taxing statute, in particular, is to "prevent the state from exceeding its powers to tax interstate and foreign commerce" while permitting the state to "tax that portion of commerce activity that occurred within the state." Tropical Shipping, 364 So.2d at 435; see also Klosters Rederi, 348 So.2d at 660 ("[W]e believe that the intent of Section 212.08(8), as interpreted through the rules of respondent, was to tax an interstate and/or foreign commerce carrier only upon the basis of presence within the territorial limits of the State of Florida."). Adopting the DOR's scheme would invalidate the purpose underlying the proration provision and might subject this Court's sales and use tax statute to constitutional challenge.
The Dream Boat court reached its determination that cruises-to-nowhere constitute exclusively intrastate commerce after eliminating the possibility that such ventures could be deemed foreign or interstate commerce. See 28 Fla. L. Weekly at D838, ___ So.2d at ___. In support of this proposition, the Dream Boat court relied on the following definitions of "interstate" and "foreign" commerce:
Commerce with foreign nations means "every species of commercial intercourse between the United States and foreign nations." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 193, 6 L.Ed. 23 (1824). Commerce "among the several states," i.e., interstate commerce, is "commerce which concerns more States than one." Id. at 194. Thus, "foreign commerce" would be commerce which concerns more than one nation. See, e.g., Lord v. Steamship Co., 102 U.S. (12 Otto) 541, 26 L.Ed. 224 (1880).
Dream Boat, 28 Fla. L. Weekly at D838, ___ So.2d at ___. Based upon these definitions, coupled with the determination that the territorial sea of the United States extends twelve miles offshore,[7] the district court determined, "Cruises to nowhere that do not leave U.S. territorial waters cannot be engaged in foreign commerce." Id. In so doing, the Dream Boat court drew a distinction between "vessels that leave Florida's borders but return to the same port without having entered foreign or international waters, and those vessels that have entered foreign territory or international waters." Id.; accord United States v. Montford, 27 F.3d 137, 139 (5th Cir.1994) (holding that a "`cruise to nowhere,' where the vessel has no contact whatsoever with a foreign country or waters within the jurisdiction of a foreign country, and where indeed, no such contact is intended, does not involve foreign commerce" under federal statute proscribing ship-to-shore bet making).
We agree with the definitions of "interstate commerce" and "foreign commerce" employed by the district court in Dream Boat. We also agree with the Dream Boat court's implicit application of that definition to conclude that cruise-to-nowhere operations that do not enter the territorial waters of another state or otherwise deal in commerce concerning another state are not engaged in interstate commerce. We cannot agree, however, with the First District's conclusion that cruises-to-nowhere do not leave the country's territorial waters and thus cannot engage in foreign commerce.
*964 In rendering that determination, the Dream Boat court cited the 1996 Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), see Pub.L. No. 104-132, 110 Stat. 1214, noted in 18 U.S.C § 7 (2000), for the proposition that the country's seaward boundary extends twelve miles offshore. The AEDPA indeed recognizes a twelve-mile territorial sea by reference to Presidential Proclamation 5928, which President Reagan issued in 1988 to extend the nation's territorial sea from three to twelve miles. However, as the following passage makes clear, the AEDPA extends the boundary for purposes of federal criminal jurisdiction only:
The Congress declares that all the territorial sea of the United States, as defined by Presidential Proclamation 5928 of December 27, 1988, for purposes of Federal criminal jurisdiction is part of the United States, subject to its sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code.
Pub.L. No. 104-132, § 901(a), 110 Stat. 1214, 1317 (1996).
Presidential Proclamation 5928, which itself extended the country's territorial waters with the caveat that it did not extend or otherwise alter then-existing federal or state law, see Proclamation No. 5928, 3 C.F.R. 547 (Dec. 27, 1988), reprinted in 43 U.S.C. § 1331 (2000), is based on the United Nations Convention on the Law of the Sea, concluded on December 10, 1982 (UNCLOS). See 1833 U.N.T.S. 3 (entered into force Nov. 16, 1994). UNCLOS divides the waters of a coastal country into four zones, including internal waters, the territorial sea, the contiguous zone, and the exclusive economic zone. UNCLOS provides that from a nation's coastal baseline, the territorial sea extends 12 nautical miles, the contiguous zone extends 24 nautical miles, and the exclusive economic zone extends as far as 200 nautical miles. See 1833 U.N.T.S. at 401-02, 409, 418-19.
The United States is not a signatory to UNCLOS, but has relied upon the boundaries established in that convention to define the extent of the nation's navigable waters. See 33 C.F.R. §§ 2.20, 2.22, 2.30, 2.32 (2004). Federal regulation enumerates the purposes for which the nation's territorial sea extends for twelve miles:
(a) With respect to the United States, the following apply 
(1) Territorial sea means the waters, 12 nautical miles wide, adjacent to the coast of the United States and seaward of the territorial sea baseline for 
(i) Statutes included within subtitle II and subtitle VI, title 46, U.S.C. [Shipping]; the Ports and Waterways Safety Act, as amended (33 U.S.C. [§§]1221-1232); the Act of June 15, 1917, as amended (50 U.S.C. [§§]191-195) [War and National Defense]; and the Vessel Bridge-to-Bridge Radiotelephone Act (33 U.S.C. [§§]1201-1208), and any regulations issued under the authority of these statutes.
(ii) Purposes of criminal jurisdiction pursuant to Title 18, United States Code.
(iii) The special maritime and territorial jurisdiction as defined in 18 U.S.C. [§]7.
(iv) Interpreting international law.
(v) Any other treaty, statute, or regulation, or amendment thereto, interpreted by the Coast Guard as incorporating the definition of territorial sea as being 12 nautical miles wide, adjacent to the *965 coast of the United States and seaward of the territorial sea baseline.
33 C.F.R. § 2.22(a)(1) (2004).
For all other purposes these regulations provide:
(2) Unless otherwise specified in paragraph (a)(1) of this section, territorial sea means the waters, 3 nautical miles wide, adjacent to the coast of the United States and seaward of the territorial sea baseline.
33 C.F.R. § 2.22(a)(2) (2004) (emphasis supplied).
As the excerpted regulation makes clear, whether the nation's seaward boundary falls three or twelve miles offshore is context-specific. Importantly, federal law governing shipboard gambling applies a three-mile territorial sea. The Gambling Ships Act, see 18 U.S.C. §§ 1081-84 (2000), which makes it illegal for a United States citizen, resident, or anyone aboard an American-flagged vessel or otherwise subject to the jurisdiction of the United States, to operate a gambling ship, see id. § 1082, specifically exempts vessels on which gambling occurs outside of the territorial waters of the United States.[8] The Act cross references an Internal Revenue Code provision, the implementing regulation for which defines "territorial waters" as those extending three miles offshore. See 18 U.S.C. § 1081 (2000); 26 C.F.R. § 43.4472-1 (2004) (defining "territorial waters" as "those waters within the international boundary line between the United States and any contiguous foreign country or within 3 nautical miles (3.45 statute miles) from low tide on the coastline").
In sum, there is no overarching, binding authority for the proposition that the United States's seaward boundary is twelve miles for the purpose of determining that a vessel sailing greater than three but not more than twelve miles offshore is not engaged in foreign commerce, and thus ineligible for the partial tax exemption. While the extent of the United States's territorial sea is generally variable, and indeterminate for purposes of the instant action, the extent of this state's seaward boundary is clear. Cruise-to-nowhere operations leave the state of Florida during the course of their voyages. For this reason, Dream Boat erred in determining that cruise-to-nowhere operations cannot be categorized as "foreign commerce" and thus must be "intrastate" in nature.
Prior to disposing of the instant matter, it bears mentioning that there is a completely separate ground upon which this Court can decide this case. With regard to the narrow factual scenario presented here, we determine that the DOR inappropriately bifurcated New Sea Escape's operations for the purpose of assessing tax liability. It is beyond dispute that the company engages in foreign commerce when it makes one-day trips from Fort Lauderdale to Freeport, Bahamas. Assuming, for the moment, that cruise-to-nowhere operations are "intrastate" in nature, there is no basis in either the statute or the DOR's implementing regulations to parse a carrier's operations or a vessel's voyages, and deny a carrier who engages in foreign commerce, as well as intrastate commerce, the partial exemption for its intrastate commerce operations. Indeed, reviewing courts have dispensed with similar *966 artificial distinctions in the past. See Tropical Shipping, 364 So.2d at 436 (rejecting distinction between trailers with wheels and containers without wheels for assessing sales tax under section 212.08(8)); United Parcel Serv., Inc. v. State Office of the Comptroller, 443 So.2d 263 (Fla. 1st DCA 1983) (rejecting the Comptroller's attempt to limit the partial exemption for vehicles engaged in interstate commerce to those UPS vehicles that had only traveled within the state). However, as previously discussed, we need not decide this matter based on the DOR's inappropriate bifurcation of New Sea Escape's tax liability because the DOR's construction of the partial tax exemption contravenes the plain meaning and recognized purpose of that provision.

CONCLUSION
For the foregoing reasons we approve the decision of the district court in New Sea Escape applying the partial tax exemption to cruise-to-nowhere operations, and disapprove the decision of the First District in Dream Boat as described herein.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, CANTERO, and BELL, JJ., concur.
QUINCE, J., concurs in result only.
NOTES
[1] Interest continues to accrue at a rate of $236.29 per day.
[2] New Sea Escape asserted that during each of the four cruises-to-nowhere sailed during the test period, the ship traveled two miles from Port Everglades to the inlet buoy and three miles from the inlet buoy until the vessel was beyond the State of Florida's three-mile seaward boundary. This resulted in a total of ten "Florida miles" per cruise-to-nowhere.
[3] The district court's holding with regard to the taxability of the gambling concession proceeds and untaxability of the food and beverage concessions is not at issue in this review.
[4] The Third District cited as authority United Air Lines, Inc. v. Mahin, 410 U.S. 623, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973), where the U.S. Supreme Court held that imposition of a use tax under a similarly worded Illinois statute to the withdrawal from storage of fuel to be used by an interstate carrier did not offend the Commerce Clause of the United States Constitution. See id. at 629, 93 S.Ct. 1186.
[5] We similarly reject DOR's assertion that foreign commerce requires stopping in a foreign port. This position undermines a host of Commerce Clause cases standing for the proposition that oceanic navigation constitutes foreign commerce. See The Vessel "Abby Dodge" v. United States, 223 U.S. 166, 176, 32 S.Ct. 310, 56 L.Ed. 390 (1912); Lord v. Goodall, Nelson & Perkins S.S. Co., 102 U.S. (12 Otto) 541, 544, 26 L.Ed. 224 (1880); see also Sales Tax Dist. No. 1 v. Express Boat Co., 500 So.2d 364, 370 (La.1987).
[6] The state constitution provides that Florida's eastern territorial waters extend into the Atlantic to "the edge of the Gulf Stream or a distance of three geographic miles whichever is greater." Art. II, § 1, Fla. Const. (2002). Neither party offered any evidence during the proceeding below that the Gulf Stream was at a distance greater than three miles off of the Atlantic Coast during the relevant time period, so a seaward boundary of three miles will be assumed for the instant analysis. Cf. Benson v. Norwegian Cruise Line Ltd., 859 So.2d 1213, 1216-17 (Fla. 3d DCA 2003) (holding that medical malpractice occurring on a cruise ship 11.7 miles off of Florida's coast occurred within Florida's territorial waters based on expert evidence establishing that the Gulf Stream was 14 nautical miles east of the relevant portion of Florida's coastline on the day in question), review dismissed, 885 So.2d 388 (Fla.2004).
[7] In Deerbrooke, the Fourth District has echoed this conclusion, stating, "U.S. territorial limits have been extended beyond their three-mile limit to twelve miles by presidential proclamation." Deerbrooke, 861 So.2d at 448; see also Benson, 859 So.2d at 1216 n. 5 ("The United States has adopted a territorial sea of twelve nautical miles.").
[8] At least one federal court has determined that the expansion of federal criminal jurisdiction from three to twelve miles by the AEDPA did not implicitly amend the Gambling Ships Act to criminalize casino gambling on ships sailing between three and twelve nautical miles at sea. See United States v. One Big Six Wheel, 166 F.3d 498, 499 (2d Cir.1999).