(Slip Opinion) OCTOBER TERM, 2008 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## POLAR TANKERS, INC. *v.* CITY OF VALDEZ, ALASKA

### CERTIORARI TO THE SUPREME COURT OF ALASKA

No. 08–310.   Argued April 1, 2009—Decided June 15, 2009

A Valdez, Alaska, ordinance that imposes a personal property tax on certain boats and vessels contains exceptions which, in effect, largely limit its applicability to large oil tankers. Petitioner Polar Tankers, Inc., whose vessels transport crude oil from the Port of Valdez to refineries in other States, challenged the ordinance in state court, claiming (1) that the tax was unconstitutional under Art. I, §10, cl. 3, which forbids a "State . . . without the Consent of Congress, [to] lay any Duty of Tonnage," and (2) that the tax's value-allocation method violated the Commerce and Due Process Clauses. The court rejected the Tonnage Clause claim, but accepted the Commerce Clause and Due Process Clause claim. On appeal, the State Supreme Court upheld the tax, finding that because it was a value-based property tax, the tax was not a duty of tonnage. The State Supreme Court also held the allocation method was fair and thus valid under the Commerce and Due Process Clauses.

*Held:* The judgment is reversed, and the case is remanded.

182 P. 3d 614, reversed and remanded.

JUSTICE BREYER delivered the opinion of the Court with respect to Parts I, II–A, and II–B–1, concluding that Valdez's tax violates the Tonnage Clause. Consequently, Polar Tankers' alternative Commerce Clause and Due Process Clause arguments need not be considered. Pp. 3–8.

(a) This Court has consistently interpreted the language of the Tonnage Clause in light of its purpose, which mirrors the intent of other constitutional provisions that seek to restrain the States from exercising the taxing power in a way that is injurious to the interests of other States. The Clause seeks to prevent States from nullifying Art. I, §10, cl. 2's prohibition against import and export duties by taxing "the vessels transporting the merchandise." *Clyde Mallory Lines*

v. *Alabama ex rel. State Docks Comm'n*, 296 U. S. 261, 265.  It also reflects an effort to diminish a State's ability to obtain tax advantages based on its favorable geographic position.  Because the Clause forbids a State to "do that indirectly which she is forbidden . . . to do directly," *Passenger Cases*, 7 How. 283, 458, the "prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port," *Clyde Mallory Lines, supra*, at 265–266.  Pp. 3–6.

(b) This case lies at the heart of what the Tonnage Clause forbids.  The ordinance seems designed to impose "a charge for the privilege of entering, trading in, or lying in a port."  The tax applies almost exclusively to oil tankers, but to no other form of personal property.  An oil tanker can be subject to the tax based on a single entry into the port.  Moreover, the tax is closely correlated with cargo capacity.  Contrary to Valdez's argument, the fact that the tax is designed to raise revenue for general municipal services argues for, not against, application of the Clause.  Pp. 6–8.

JUSTICE BREYER, joined by JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE GINSBURG, rejected, in Part II–B–2, Valdez's claim that, under *State Tonnage Tax Cases*, 12 Wall. 204, its tax is "not within the prohibition of the Constitution," because it is "levied . . . upon ships . . . as property, based on a valuation of the same as property," *id.,* at 213 (emphasis deleted).  This Court later made clear that the "prohibition" against tonnage duties "comes into play" where vessels "are not taxed in the *same manner* as the other property of the citizens," *Transportation Co.* v. *Wheeling*, 99 U. S. 273, 284.  This qualification, important in light of the Clause's purpose, means that, in order to fund services by taxing ships, a State must also impose similar taxes upon other businesses.  Valdez fails to satisfy this requirement.  The Court can find little, if any, other personal property that Valdez taxes.  Because its value-related property tax on mobile homes, trailers, and recreational vehicles applies only if they are "affixed" to a particular site, it taxes those vehicles as a form of real, not personal, property.  Valdez also claims that its ship tax is simply another form of a value-based tax on oil-related property provided by state law.  But Valdez's tax, a purely a municipal tax, differs from the tax on other oil-related property, which is primarily a state-level tax, in several ways.  As a result of these differences, an ordinary oil-related business finding the tax on its movable property too burdensome must complain to the State, which is in charge of setting the manner of assessment and valuation.  At the same time, an oil tanker finding its vessel tax too burdensome must complain to Valdez, for the State

has nothing to do with that tax's rate, valuation, or assessment. There is also no effective electorate-related check on Valdez's vessel-taxing power comparable to the check available when a property tax is more broadly imposed. Valdez's property tax hits only ships; it is not constrained by any need to treat ships and other business property alike. Thus, Valdez's tax lacks the safeguards implied by this Court's statements that a property tax on ships escapes the Tonnage Clause's scope only when that tax is imposed upon ships "in the same manner" as it is imposed on other forms of property. Pp. 8–13.

THE CHIEF JUSTICE, joined by JUSTICE THOMAS, agreed that Valdez's tax is unconstitutional, but concluded that the city's argument that its tax may be sustained as a property tax similar to ones the city imposes on other property should be rejected because an unconstitutional tax on maritime commerce does not become permissible when bundled with taxes on other activities or property. Pp. 1–3.

JUSTICE ALITO agreed that Valdez's tax is unconstitutional, but concluded that the tax is an unconstitutional duty of tonnage even if the Tonnage Clause permits a true, evenhanded property tax to be applied to vessels. P. 1.

BREYER, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and II–B–1, in which SCALIA, KENNEDY, GINSBURG, and ALITO, JJ., joined, and an opinion with respect to Part II–B–2, in which SCALIA, KENNEDY, and GINSBURG, JJ., joined. ROBERTS, C. J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined. ALITO, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–310

POLAR TANKERS, INC., PETITIONER *v.* CITY OF VALDEZ, ALASKA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ALASKA

[June 15, 2009]

JUSTICE BREYER announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and II–B–1, and an opinion with respect to Part II–B–2, in which JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE GINSBURG join.

The Constitution forbids a "State . . . without the Consent of Congress, [to] lay any Duty of Tonnage." Art. I, §10, cl. 3. The city of Valdez, Alaska, has enacted an ordinance that imposes a personal property tax upon the value of large ships that travel to and from that city. We hold that the ordinance violates the Clause.

I

In 1999, the city of Valdez, Alaska (City), adopted an ordinance imposing a personal property tax upon "[b]oats and vessels of at least 95 feet in length" that regularly travel to the City, are kept or used within the City, or which annually take on at least $1 million worth of cargo or engage in other business transactions of comparable value in the City. Valdez Ordinance No. 99–17 (1999) (codified as Valdez Municipal Code §3.12.020 (2008)). The ordinance contains exceptions that, in effect, limit the tax's applicability primarily to large oil tankers. *Ibid.*

And the City applies the tax in accordance with a value-allocation system that adjusts the amount owed downwards insofar as the tankers spend time in other ports. Valdez, Alaska Resolution No. 00–15, App. to Pet. for Cert. 53a–56a.

Polar Tankers, Inc., a subsidiary of ConocoPhillips, owns vessels that transport crude oil from a terminal in the Port of Valdez (located at the southern end of the Trans Alaska Pipeline System) to refineries in California, Hawaii, and Washington. In August 2000, Polar Tankers filed a lawsuit in Alaska Superior Court challenging the tax as unconstitutional. Polar Tankers argued that the tax effectively imposed a fee on certain vessels for the privilege of entering the port; hence it amounted to a constitutionally forbidden "Duty of Tonnage." It also argued that the tax calculation method (as applied to vessels with a tax situs elsewhere) violated the Commerce and Due Process Clauses by failing to take account of the time a ship spent at sea or being serviced or repaired. Polar Tankers said that the method thereby overstated the percentage of the ship's total earning capacity reasonably allocated to time spent in the Port of Valdez.

The Alaska Superior Court rejected the Tonnage Clause claim, but it accepted the Commerce Clause and Due Process Clause claim. And, for that reason, it held the tax unconstitutional. On appeal, the Alaska Supreme Court, rejecting both claims, upheld the tax. In respect to the Tonnage Clause claim, the Supreme Court noted that Valdez's tax was a value-based property tax designed to pay for "services available to all taxpayers in the city," including Polar Tankers; and it concluded that "a charge based on the value of property is not a duty of tonnage." 182 P. 3d 614, 623 (2008) (citing *Transportation Co.* v. *Wheeling*, 99 U. S. 273 (1879)). In respect to the Commerce Clause and Due Process Clause claim, the Supreme Court held that Valdez's allocation method was fair, hence

constitutional. 182 P. 3d, at 617–622.

Polar Tankers asked us to review the Alaska Supreme Court's determination. And we granted its petition in order to do so.

## II

## A

We begin, and end, with Polar Tankers' Tonnage Clause claim. We hold that Valdez's tax is unconstitutional because it violates that Clause. And we consequently need not consider Polar Tankers' alternative Commerce Clause and Due Process Clause argument.

When the Framers originally wrote the Tonnage Clause, the words it uses, "Duty of Tonnage," referred in commercial parlance to "a duty" imposed upon a ship, which duty varies according to "the internal cubic capacity of a vessel," *i.e.*, its tons of carrying capacity. *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n*, 296 U. S. 261, 265 (1935) (citing *Inman S. S. Co.* v. *Tinker*, 94 U. S. 238, 243 (1877)); see also T. Cooley, Constitutional Limitations 596 (6th ed. 1890). Over a century ago, however, this Court found that the Framers intended those words to refer to more than "a duty" that sets a "certain rate on each ton" of capacity. *Steamship Co.* v. *Portwardens*, 6 Wall. 31, 34 (1867).

The Court over the course of many years has consistently interpreted the language of the Clause in light of its purpose, a purpose that mirrors the intent of other constitutional provisions which, like the Tonnage Clause itself, seek to "restrai[n] the states themselves from the exercise" of the taxing power "injuriously to the interests of each other." J. Story, Commentaries on the Constitution of the United States §497, p. 354 (1833) (abridged version). Article I, §10, cl. 2, for example, forbids States to "lay any Imposts or Duties on Imports or Exports." It thereby seeks to prevent states with "convenient ports" from plac-

ing other States at an economic disadvantage by laying levies that would "ta[x] the consumption of their neighbours." 3 Records of the Federal Convention of 1787, pp. 542, 519 (M. Farrand rev. 1966) (reprinting James Madison, Preface to Debates in the Convention of 1787 and letter from James Madison to Professor Davis, 1832). The coastal States were not to "take advantage of their favorable geographical position in order to exact a price for the use of their ports from the consumers dwelling in less advantageously situated parts of the country." *Youngstown Sheet & Tube Co.* v. *Bowers*, 358 U. S. 534, 556–557 (1959) (Frankfurter, J., dissenting).

In writing the Tonnage Clause, the Framers recognized that, if "the states had been left free to tax the privilege of access by vessels to their harbors the prohibition against duties on imports and exports could have been nullified by taxing the vessels transporting the merchandise." *Clyde Mallory Lines*, *supra*, at 265. And the Court has understood the Tonnage Clause as seeking to prevent that nullification. See *Steamship Co.*, *supra*, at 34–35; see also *Packet Co.* v. *Keokuk*, 95 U. S. 80, 87 (1877); *Gibbons* v. *Ogden*, 9 Wheat. 1, 202 (1824). It has also understood the Clause as reflecting an effort to diminish a State's ability to obtain certain geographical vessel-related tax advantages whether the vessel in question transports goods between States and foreign nations or, as here, only between the States. Compare *Inman, supra* (invalidating a fee applied to ships engaged in foreign commerce), with *Steamship Co.*, *supra* (invalidating a tax applied to ships engaged in interstate commerce).

Interpreting the Clause in light of its "intent," *id.*, at 34, the Court has read its language as forbidding a State to "do that indirectly which she is forbidden . . . to do directly." *Passenger Cases*, 7 How. 283, 458 (1849). Thus, the Court has said that the Clause, which literally forbids a State to "levy a duty or tax . . . graduated on the ton-

nage," must also forbid a State to "effect the same purpose by merely changing the ratio, and graduating it on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries." *Id.*, at 458–459. A State cannot take what would otherwise amount to a tax on the ship's capacity and evade the Clause by calling that tax "a charge on the owner or supercargo," thereby "justify[ing] this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import." *Id.*, at 459.

The Court has consequently stated that the Tonnage Clause prohibits, "not only a *pro rata* tax . . ., but any duty on the ship, whether a fixed sum upon its whole tonnage, or a sum to be ascertained by comparing the amount of tonnage with the rate of duty." *Steamship Co., supra*, at 35. And, summarizing earlier cases while speaking for a unanimous Court, Justice Stone concluded that the "prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines, supra*, at 265–266. Cf. *Cannon* v. *New Orleans*, 20 Wall. 577 (1874) (invalidating a tax imposed on ships entering a port, which tax was graduated based on the ships' capacity and length of stay); *Inman, supra* (invalidating a fee imposed on ships of a certain capacity that entered a port); *Steamship Co., supra* (invalidating a flat tax imposed on every ship that entered a port, regardless of the ship's capacity).

Although the Clause forbids all charges, whatever their form, that impose "a charge for the privilege of entering, trading in, or lying in a port," nothing in the history of the adoption of the Clause, the purpose of the Clause, or this Court's interpretation of the Clause suggests that it oper-

ates as a ban on *any and all* taxes which fall on vessels that use a State's port, harbor, or other waterways. See *post*, at 1–2 (ROBERTS, C. J., concurring in part and concurring in judgment). Such a radical proposition would transform the Tonnage Clause from one that protects vessels, and their owners, from discrimination by seaboard States, to one that gives vessels preferential treatment vis-à-vis all other property, and its owners, in a seaboard State. The Tonnage Clause cannot be read to give vessels such "preferential treatment." Cf. *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276, 287 (1976) (noting, in a related context, that the Import-Export Clause "cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies"). See also *infra* this page and 7–11.

## B

### 1

Does the tax before us impose "a charge for the privilege of entering, trading in, or lying in a port"? Certainly, the ordinance that imposes the tax would seem designed to do so. It says that the tax applies to ships that travel to (and leave) the City's port regularly for business purposes, that are kept in the City's port, that take on more than $1 million in cargo in that port, or that are involved in business transactions in that amount there. In practice, the tax applied in its first year to 28 vessels, of which 24 were oil tankers, 3 were tugboats, and 1 was a passenger cruise ship. App. 53. The ordinance applies the tax to no other form of personal property. See Valdez Municipal Code §3.12.030(A)(2) (2008).

Moreover, the tax's application and its amount depend upon the ship's capacity. That is to say, the tax applies only to large ships (those at least 95 feet in length), while exempting small ones. See §3.12.020(A)(1).

Nor can Valdez escape application of the Clause by claiming that the ordinance imposes, not a duty or a tax, but a fee or a charge for "services rendered" to a "vessel," such as "pilotage," "wharfage," "medical inspection," the "use of locks," or the like. *Clyde Mallory Lines,* 296 U. S*.,* at 266; see also *Inman,* 94 U. S*.,* at 243. To the contrary, the ordinance creates a tax designed to raise revenue used for general municipal services. See 182 P. 3d, at 623; Valdez, Alaska Resolution No. 00–15, App. to Pet. for Cert. 53a–56a. Tonnage Clause precedent makes clear that, where a tax otherwise qualifies as a duty of tonnage, a general, revenue-raising purpose argues in favor of, not against, application of the Clause. See *Steamship Co.,* 6 Wall*.,* at 34.

This case lies at the heart of what the Tonnage Clause forbids. The ordinance applies almost exclusively to oil tankers. And a tax on the value of such vessels is closely correlated with cargo capacity. Because the imposition of the tax depends on a factor related to tonnage and that tonnage-based tax is not for services provided to the vessel, it is unconstitutional.

The dissent contends that the tax does not operate as "a charge for the privilege of entering, trading in, or lying in a port," *Clyde Mallory Lines, supra*, at 265–266—that is, as an impermissible tonnage duty—because Valdez levies its tax only upon vessels that meet a "tax situs" requirement. See *post*, at 6–7 (opinion of STEVENS, J.). But in this case, the distinction the dissent draws between tonnage duties and property taxes is a distinction without a difference. That is because to establish a tax situs under the tax challenged here, an oil tanker needs only to enter the port and load oil worth more than $1 million. And, as Polar Tankers notes, oil tankers routinely carry millions of barrels of oil at a time worth well in excess of $1 million. Reply Brief for Petitioner 6. Thus, by virtue of a single entry into the port, "trading" once in that port, or "lying"

once in that port, a tanker automatically establishes a tax situs in Valdez. No one claims that this basis for establishing a tax situs is insufficient under the Constitution. After all, a nondomiciliary jurisdiction may constitutionally tax property when that property has a "substantial nexus" with that jurisdiction, and such a nexus is established when the taxpayer "avails itself of the substantial privilege of carrying on business" in that jurisdiction. See *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 441–445 (1979) (internal quotation marks omitted); *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U. S. 425, 437 (1980) (same); *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 312 (1992). Here, the City identified the 28 vessels that were subject to the tax in the year 2000. But the City fails to point to a single oil tanker, or any vessel greater than 95 feet in length, that both entered the port and failed to establish a tax situs. See App. 53. What else is needed to show that a tax characterized as one on property may nevertheless function as a "charge for the privilege of entering . . . a port"?

### 2

Valdez does not deny that its tax operates much like a duty applied exclusively to ships. But, like the Alaska Supreme Court, it points to language in an earlier Court opinion explicitly stating that "[t]axes levied . . . upon ships . . . as property, based on a valuation of the same as property, are not within the prohibition of the Constitution." *State Tonnage Tax Cases*, 12 Wall. 204, 213 (1871) (emphasis deleted); cf. 182 P. 3d, at 622, and n. 43. Valdez says that its tax is just such a value-related tax on personal property and consequently falls outside the scope of the Clause. Brief for Respondent 16–23.

Our problem with this argument, however, is that the Court later made clear that the Clause does not apply to "taxation" of vessels "as property *in the same manner* as

other personal property owned by citizens of the State." "[W]here" vessels "are not taxed *in the same manner* as the other property of the citizens," however, the "prohibition . . . comes into play." *Wheeling*, 99 U. S., at 284 (emphasis added).

Viewed in terms of the purpose of the Clause, this qualification is important. It means that, in order to fund services by taxing ships, a State must also impose similar taxes upon other businesses. And that fact may well operate as a check upon a State's ability to impose a tax on ships at rates that reflect an effort to take economic advantage of the port's geographically based position. After all, the presence of other businesses subject to the tax, particularly businesses owned and operated by state residents, threatens political concern and a potential ballot-box issue, were rates, say, to get out of hand. See *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 315 (1852); cf. *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 185, n. 2 (1938) (when state action affecting interstate commerce "is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state").

Moreover, and at the very least, a "same manner" requirement helps to assure that a value-related property tax differs significantly from a graduated tax on a ship's capacity and that the former is not simply a redesignation of the latter. See *Packet Co.*, 95 U. S., at 88 ("'It is the thing and not the name that is to be considered'" (quoting *Cooley*, *supra*, at 314)).

In our view, Valdez fails to satisfy this requirement. It does not tax vessels "in the same manner as other personal property" of those who do business in Valdez.

*Wheeling*, *supra*, at 284.  We can find little, if any, other personal property that it taxes.  According to the State of Alaska, Valdez specifically exempts from property taxation motor vehicles, aircraft, and other vehicles, as well as business machinery.  See Dept. of Community and Economic Development, Division of Community and Business Development, Office of the State Assessor, Alaska Taxable 2001, p. 20 (Jan. 2002), (Table 4), online at http://www.commerce.state.ak.us/dca/Taxable/AKTaxable2 001.pdf (as visited June 10, 2009, and available in Clerk of Court's case file).

We concede, as Valdez points out, that a different Valdez ordinance imposes what it characterizes as a value-based property tax on mobile homes, trailers, and recreational vehicles. Valdez Municipal Code §3.12.022 (2008); Brief for Respondent 24–25.  But that same ordinance exempts those vehicles from its property tax unless they are "affixed" to a particular site.   Hence, whatever words the City uses to describe the tax imposed on mobile homes, trailers, and recreational vehicles, Valdez in fact taxes those vehicles only when they constitute a form, not of personal property, but of real property (like a home). See §3.12.022  (providing that "trailers and mobile homes" are "subject to taxation" when they are classified as "real property").

Valdez also points to a separate City ordinance that imposes a tax "on all taxable property taxable under Alaska Statutes Chapter 43.56."  §3.28.010 (2008). The Alaska Statutes Chapter identifies as taxable "aircraft and motor vehicles" the operation of which "relates to" the "exploration for, production of, or pipeline transportation of gas or unrefined oil."  Alaska Stat. §43.56.210 (2008). Valdez claims that its tax on ships is simply another form of this value-related tax on oil-related property.

Valdez did not make this claim in the lower courts, however.  Nor does the State of Alaska (which has filed a

brief in support of Valdez) support this particular claim. Brief for State of Alaska et al. as *Amici Curiae* 32–33. Thus, we lack the State's explanation of just how the tax on oil-related vehicles works. And, lacking precise information, we might ordinarily decline to consider this claim. See, *e.g., Clingman* v. *Beaver*, 544 U. S. 581, 597–598 (2005).

Nonetheless, the parties have argued the matter in their briefs here; and our deciding the matter now will reduce the likelihood of further litigation. We may make exceptions to our general approach to claims not raised below; and for these reasons we shall do so. See *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 39 (1989).

Addressing the claim on the basis of the briefs and what we have gleaned from publicly available sources, we note that Valdez's ship tax differs from the tax on other oil-related property in several ways. The former is a purely municipal tax. The City imposes it; the City alone determines what property is subject to the tax; the City establishes the rate of taxation; the City values the property; the City resolves evaluation disputes; the City issues assessment notices; the City collects the tax; and the City (as far as we can tell) keeps the revenue without any restrictions. See Valdez Municipal Code §3.12.020(A)(1) (2008); §3.12.060; §3.12.020(B); §§3.12.090–3.12.100; §3.12.210(A) (2001); Valdez, Alaska Resolution No. 00–15, App. to Pet. for Cert. 53a–56a.

The latter is primarily a state-level tax. The State imposes it. In fact, Valdez's city manager characterized the oil-property tax as involving "property taxed by the State . . . and [raising revenue] subsequently shared with the City." App. 46 (affidavit of Dave Dengel). In addition, the State determines the type of property subject to the tax; the State forbids the municipality to exempt any property it designates as taxable; the State regulates the rate of taxation that may be applied to property it desig-

nates as taxable; the State issues assessment notices; the State resolves evaluation disputes; and the State, while permitting the municipality to set the precise tax rate and to collect the tax, imposes certain kinds of limits upon the amount of the resulting revenue that the municipality may raise that, in effect, provide a check against excessive rates. See Alaska Stat. §43.56.010(b) (2008); §43.56.210(5)(A); 15 Alaska Admin. Code §56.010 (2009); §§56.015–56.040; Alaska Stat. §§29.45.080(b), (c) (2008); §43.56.010(c).

These differences matter. For one thing, they mean that any ordinary oil-related business, other than ships, that finds the tax imposed upon its movable property too burdensome must complain to the State, not to the City, for it is the State that is in charge of setting the manner of assessment and valuation. At the same time, an oil tanker that finds the vessel tax too burdensome must complain to the City, not to the State, for the State has nothing to do with the rate, valuation, or assessment of that particular tax.

For another thing, they mean that there is no effective electorate-related check (comparable to the check available where a property tax is more broadly imposed) upon the City's vessel-taxing power. The City's property tax hits ships and only ships; it is not constrained by any need to treat ships and other business property alike. Taken together, these two considerations mean that Valdez's property tax lacks the safeguards implied by this Court's statements that a property tax on ships escapes the scope of the Tonnage Clause only when that tax is imposed upon ships "in the same manner" as it is imposed on other forms of property.

THE CHIEF JUSTICE contends that a State may never impose a property tax on a vessel belonging to a citizen of another State, even if that vessel is taxed in the "same manner" as other personal property in the taxing state.

See *post*, at 1–2 (opinion concurring in part and concurring in judgment). But, as THE CHIEF JUSTICE concedes, this Court held in the *State Tonnage Tax Cases* and *Wheeling* that vessels belonging to a State's own citizens may be subject to a property tax when the vessels are taxed in the same manner as other personal property owned by citizens of that State. At the time those cases were decided, the home port doctrine was still in effect, which meant that vessels were taxable solely by the owner's domicile State. Since the *State Tonnage Tax Cases* and *Wheeling*, the home port doctrine has been abandoned and States are now permitted to tax vessels belonging to citizens of other States that develop a tax situs in the nondomiciliary State, provided the tax is fairly apportioned. See, *e.g.*, *Ott* v. *Mississippi Valley Barge Line Co.*, 336 U. S. 169, 172–174 (1949); *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 442–443 (1979). Given this evolution in the law governing interstate taxation since our decisions in the *State Tonnage Tax Cases* and *Wheeling*, there is little reason to think that the ability of a State to tax vessels in the "same manner" as other personal property applies only to vessels owned by citizens of the taxing State. In any event, we need not decide this issue because it is clear that the vessels subject to the City's ordinance are not taxed in the same manner as other personal property.

As far as we can tell, then, Valdez applies a value-based personal property tax to ships and to no other property at all. It does so in order to obtain revenue for general city purposes. The tax, no less than a similar duty, may (depending upon rates) "ta[x] the consumption" of those in other states. See 3 Records of the Federal Convention of 1787, at 519 (reprinting letter from James Madison to Professor Davis, 1832). It is consequently the kind of tax that the Tonnage Clause forbids Valdez to

impose without the consent of Congress, consent that Valdez lacks.

*   *   *

We conclude that the tax is unconstitutional. We reverse the contrary judgment of the Supreme Court of Alaska. And we remand the case for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–310

POLAR TANKERS, INC., PETITIONER *v.* CITY OF
VALDEZ, ALASKA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ALASKA

[June 15, 2009]

CHIEF JUSTICE ROBERTS, with whom JUSTICE THOMAS
joins, concurring in part and concurring in the judgment.

I agree with the Court's conclusion that the Valdez tax
is unconstitutional "[b]ecause the imposition of the tax
depends on a factor related to tonnage and that tonnage-
based tax is not for services provided to the vessel." *Ante*,
at 7. The plurality goes on, however, to reject the city's
argument that the tax may be sustained as a property tax
similar to ones the city imposes on other property. The
plurality rejects that argument on the ground that the city
in fact does *not* impose similar taxes on other property.
*Ante,* at 8–13. I would instead reject the argument on the
ground that it does not matter.

The Tonnage Clause applies to "any Duty of Tonnage,"
regardless of how that duty compares to other commercial
taxes. U. S. Const., Art. I, §10, cl. 3. The free flow of
maritime commerce was so important to the Framers that
they grouped the prohibition on tonnage duties with bans
on keeping troops or ships of war, entering into compacts
with other States or foreign powers, and engaging in war.
*Ibid.* In light of the Framers' goal to promote trade, and
the language of the Clause, I do not see how an unconsti-
tutional tax on maritime commerce becomes permissible
when bundled with taxes on other activities or property.
If States wish to use their geographical position to tax
national maritime commerce, they must get Congress's

consent—just as they must to engage in the other activities prohibited by Clause 3.

The majority responds that nothing in the history of the Clause, its purpose, or this Court's interpretation of it suggests that it bans all taxes on vessels using a port. *Ante*, at 5. The majority's list of interpretive tools tellingly leaves out one—the words the Framers used. The Clause by its terms provides that "No State shall, without the Consent of Congress, lay *any* Duty of Tonnage." U. S. Const., Art. I., §10, cl. 3 (emphasis added). The majority correctly concludes that the Valdez tax is a tonnage duty, *ante*, at 7, and that should be the end of the matter.

The majority also objects that this approach would give vessels "preferential treatment," when the Clause only protects vessels from discrimination. *Ante*, at 6. But the Clause says nothing about discrimination, and it should hardly come as a surprise that a constitutional ban on tonnage duties would give preferential treatment to vessels. Such protection reflects the high value the Framers placed on the free flow of maritime commerce. See *State Tonnage Tax Cases*, 12 Wall. 204, 214 (1871) ("Prior to the adoption of the Constitution the States . . . levied duties on imports and exports and duties of tonnage, and it was the embarrassments growing out of such regulations and conflicting obligations which mainly led to the abandonment of the Confederation and to the more perfect union under the present Constitution").

The plurality appears to be driven to its tax-comparison analysis only in responding to the city's contention that the tax is exempt from the Tonnage Clause under the *State Tonnage Tax Cases*, *supra*, and *Transportation Co.* v. *Wheeling*, 99 U. S. 273 (1879). Neither of those cases has any bearing here. Both cases make clear that they apply only to taxation of property owned by citizens of the State. See *State Tonnage Tax Cases*, *supra*, at 213 (referring to "[t]axes levied by a State upon ships and vessels *owned by the*

*citizens of the State*" (emphasis added)); *Wheeling, supra*, at 284 ("Property . . . *when belonging to a citizen of the State* living within her territory . . . is the subject of State taxation*" (emphasis added)).  We have never held that the Tonnage Clause allows such property taxes to be imposed on visiting ships.  Doing so would allow easy evasion of the important principles of the Clause.

  Both the plurality and JUSTICE STEVENS suggest that the evolution of the "home port doctrine" sheds light on how to read the Tonnage Clause.  See *ante*, at 12–13; *post*, at 3, n. 1 (dissenting opinion).  I disagree.  Under the home port doctrine, Polar Tankers "could not be taxed in [Valdez] at all," even if the tax were not a tonnage duty.  *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 442 (1979); *Hays* v. *Pacific Mail S. S. Co.*, 17 How. 596, 599 (1855).  In contrast, the Tonnage Clause forbids only tonnage duties, and would permit Valdez to impose other taxes on visiting ships—for example, "a reasonable charge for" the service of "policing of a harbor."  *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n*, 296 U. S. 261, 267, 266 (1935).  The demise of the home port doctrine is in no way inconsistent with reading the Tonnage Clause, as written, to ban all tonnage duties.  See *Japan Line, supra*, at 439, n. 3 (rejecting home port doctrine while expressly not reaching Tonnage Clause argument).

  In any case, because the Court has determined that Valdez's tax is unlike other municipal taxes, it does not decide whether a tonnage duty would be unconstitutional when other similar property is taxed.  See *ante*, at 13; *post*, at 1 (ALITO, J., concurring in part and concurring in the judgment).  Whatever other taxes the city might impose, this tax "operate[s] to impose a charge for the privilege of entering . . . or lying in" the port of Valdez, and is a duty of tonnage for that reason.  *Clyde Mallory, supra,* at 265–266.  I therefore concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

No. 08–310

POLAR TANKERS, INC., PETITIONER *v.* CITY OF VALDEZ, ALASKA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ALASKA

[June 15, 2009]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I join the opinion of the Court, except for Part II–B–2, which might be read to suggest that the tax at issue here would be permitted under the Tonnage Clause if the tax were a property tax levied in the same manner on other personal property within the jurisdiction. It is sufficient for present purposes that the Valdez tax is not such a personal property tax and therefore, even if the Tonnage Clause permits a true, evenhanded property tax to be applied to vessels, the Valdez tax is an unconstitutional duty of tonnage.

# SUPREME COURT OF THE UNITED STATES

No. 08–310

POLAR TANKERS, INC., PETITIONER *v.* CITY OF
VALDEZ, ALASKA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ALASKA

[June 15, 2009]

JUSTICE STEVENS, with whom JUSTICE SOUTER joins,
dissenting.

The Tonnage Clause prohibits the States and their
political subdivisions from charging ships for the privilege
of using their ports. Because this case does not involve
such a charge, I respectfully dissent.

I

The Tonnage Clause commands that "No State shall,
without the Consent of Congress, lay any Duty of Ton-
nage." U. S. Const., Art. I, §10, cl. 3. As the Court asserts,
the purpose of the Clause is to prevent States with conven-
ient ports from abusing the privileges their natural posi-
tion affords. See *ante*, at 3–4. Thus, the pertinent inquiry
in determining whether an exaction violates the Clause's
prohibitions is whether the charge is "'in its essence a
contribution claimed for the privilege of arriving and
departing from a port.'" *Transportation Co.* v. *Wheeling*,
99 U. S. 273, 283–284 (1879) (quoting *Cannon* v. *New
Orleans*, 20 Wall. 577, 581 (1874)); see *Clyde Mallory
Lines* v. *Alabama ex rel. State Docks Comm'n*, 296 U. S.
261, 265–266 (1935). In applying that principle, we have
been cognizant of its limits.

By its terms, the Tonnage Clause prohibits States from
imposing a duty on ships based on their internal cubic
capacity, see *id.*, at 265, and it similarly prohibits charges

that "effect the same purpose" as a duty of tonnage—for instance, by imposing a duty based "on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries," *Passenger Cases*, 7 How. 283, 458–459 (1849) (opinion of Grier, J.). By contrast, charges levied for other purposes are outside the Clause's reach. This Court has often approved charges for services rendered to ships to ensure their safe and convenient use of a port. See *Clyde Mallory*, 296 U. S., at 266–267. And the federal interest in protecting access to the ports generally does not prevent States from charging shipowners those taxes and fees that the States are also authorized to levy on other property. See *Wiggins Ferry Co.* v. *East St. Louis*, 107 U. S. 365, 375, 376 (1883) (upholding a "license tax" "laid upon the business of keeping a ferry"); *Wheeling*, 99 U. S., at 279 (upholding a property tax on ships).

More than a century ago, we noted that it was "too well settled to admit of question that taxes levied by a State, upon ships or vessels owned by the citizens of the State, as property, based on a valuation of the same as property, to the extent of such ownership, are not within the prohibition of the Constitution." *Ibid.* Just as "[d]raymen may be compelled to pay a license tax on every dray owned by them, hackmen on every hack, [and] tavernkeepers on their taverns in proportion to the number of the rooms which they keep for the accommodation of guests," so too can a State charge the operator of a ferry a "tax upon the boats which he employs." *Wiggins Ferry*, 107 U. S., at 375. "[V]essels of all kinds are liable to taxation as property in the same manner as other personal property owned by citizens of the State." *Wheeling*, 99 U. S., at 284; *State Tonnage Tax Cases*, 12 Wall. 204, 212–213 (1871).

From *Wheeling* and the *State Tonnage Tax Cases*, two principles emerge regarding the circumstances under which States may levy property taxes on ships. First, the

State seeking to levy the tax must show that the ship has sufficient contacts with the jurisdiction to establish a tax situs there. In our earlier cases, the existence of the situs was determined by the citizenship of the ship's owner, see *Wheeling*, 99 U. S., at 279; *State Tonnage Tax Cases*, 12 Wall., at 213, but a tax situs can also be created by a property's substantial contacts with a jurisdiction.[1] The requirement of a tax situs serves to distinguish property taxes from fees charged for the privilege of entering a port, which the Court has consistently found to violate the prohibition against duties of tonnage. See, *e.g.*, *Cannon*, 20 Wall., at 581 (holding unconstitutional "a tax upon every vessel which stops" in the city's jurisdictional waters); *Steamship Co.* v. *Portwardens*, 6 Wall. 31, 33 (1867) (invalidating a tax imposed "upon every ship entering the port" and "collected upon every entry").

Our cases also require that property taxes on ships, as with other property, be calculated based on the ship's

---

[1] Previously, courts followed the common-law "home port" doctrine, pursuant to which a ship could be taxed only by the State in which its owner was domiciled. See *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, 23–24 (1891). That doctrine has since "yielded to a rule of fair apportionment among the States," permitting any jurisdiction with which a ship has had sufficient contacts to establish a tax situs to levy a property tax on the ship in proportion to the ship's contacts with the jurisdiction. See *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 442–443 (1979); see also *Standard Oil Co.* v. *Peck*, 342 U. S. 382, 383 (1952). We have roundly rejected the doctrine in cases involving ships moving in interstate operations along the inland waters. See *ibid.* And in the context of ocean-going ships, we have referred to the doctrine as "'anachronistic'" and all but "'abandoned,'" noting that "to rehabilitate the 'home port doctrine' as a tool of Commerce Clause analysis would be somewhat odd." *Japan Line*, 441 U. S., at 443. In light of these developments, it is odd indeed that THE CHIEF JUSTICE endeavors to distinguish *Transportation Co.* v. *Wheeling*, 99 U. S. 273 (1879), and the *State Tonnage Tax Cases*, 12 Wall. 204 (1871), as "apply[ing] only to taxation of property owned by citizens of the State." See *ante*, at 2 (opinion concurring in part and concurring in judgment).

value. When a State levies a property tax on ships, the prohibition of the Tonnage Clause comes into play only if the ships are "not taxed in the same manner as the other property of the citizens, or where the tax is imposed upon the vessel as an instrument of commerce, without reference to the value as property." *Wheeling*, 99 U. S., at 284. Although the meaning of *Wheeling*'s "same manner" language is not immediately apparent, the remainder of the opinion emphasizes the importance of the method by which the tax on the petitioner's ships was calculated— *i.e.*, "based on a valuation of the same as property"— rather than the city's taxation of other property in the jurisdiction. *Id.*, at 279; see *id.*, at 284.

Our decision in the *State Tonnage Tax Cases* is to the same effect, as we held that taxes levied on ships "*as property, based on a valuation of the same* as property, are not within the prohibition of the Constitution," but if States tax ships "by a tonnage duty, or indirectly by imposing the tax upon the master or crew, they assume a jurisdiction which they do not possess." 12 Wall., at 213, 214 (emphasis in original). Indeed, each of the taxes challenged in that case was invalidated because it was "levied on the steamboats wholly irrespective of the value of the vessels as property, and solely and exclusively on the basis of their cubical contents." *Id.*, at 217; see *id.*, at 224 (holding the tax unconstitutional because "the amount of the tax depends upon the carrying capacity of the steamboat and not upon her value as property").[2] Thus, in

—————

[2] The Court seems to conflate these methods of calculating taxes on ships, as it asserts that "a tax on the value of such vessels is closely correlated with cargo capacity" and concludes that the tax in this case "depends on a factor related to tonnage." *Ante*, at 7; see also *ante*, at 1 (opinion of ROBERTS, C. J.). This is contrary to our longstanding recognition that a ship's capacity is not a proxy for its value: "[T]he experience of every one shows that a small steamer, new and well built, may be of much greater value than a large one, badly built or in need of

both *Wheeling* and the *State Tonnage Tax Cases*, the method by which the challenged tax was calculated was essential to the Court's determination of its validity.

The tax in this case has both of the critical characteristics of a legitimate property tax. It is undisputed that petitioner's ships "are taxed based on their value, and only those [ships] that have acquired a taxable situs in Valdez are taxed." 182 P. 3d 614, 622 (Alaska 2008). Accordingly, I would uphold the Alaska Supreme Court's decision sustaining the tax against petitioner's Tonnage Clause challenge.

The plurality reaches the opposite conclusion because it reads *Wheeling*'s "same manner" language to impose a different limitation on the States' power to tax ships. According to the plurality, "in order to fund services by taxing ships, a State must also impose similar taxes upon other businesses." *Ante*, at 9. As discussed above, *Wheeling* and the *State Tonnage Cases* are better read to require that property taxes on ships be assessed based on the value of the ship rather than its tonnage. But even if the "same manner" requirement did not clearly refer to the method of calculating the tax, the phrase could not bear the weight the plurality places on it. And there is no other support in our cases or in the text of the Tonnage Clause for a rule that conditions a State's exercise of its admitted authority to levy property taxes on ships upon its decision also to tax other property within its jurisdiction.

Under the plurality's reading, the same tax could be a "Duty of Tonnage" in one instance and not in another depending on taxing decisions wholly outside the Clause's reach. Far from being compelled by our earlier cases, this rule is in tension with our decisions noting the substantial flexibility States must be afforded in making taxing decisions and cautioning courts not to "subject the essential

———————

extensive repairs." *State Tonnage Tax Cases*, 12 Wall., at 224.

taxing power of the State to an intolerable supervision." *Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 159 (1930). That tension is compounded by the inevitable difficulty States will have in navigating the new rule, as the plurality does not suggest at what point a State can be satisfied that it has taxed enough other property that it may also tax ships without violating the Clause's prohibitions.

In support of its understanding of the "same manner" requirement, the plurality asserts that the rule "helps to assure that a value-related property tax differs significantly from a graduated tax on a ship's capacity and that the former is not simply a redesignation of the latter." *Ante*, at 9. But our cases provide such assurance without resort to the plurality's strained reading. Because States and their political subdivisions only have authority to tax property that has established a tax situs in the jurisdiction, they cannot levy such taxes on ships merely for the privilege of entering or leaving the port; much more substantial contact with the jurisdiction is required. See Valdez Municipal Code §3.12.020(C) (2008); *Central R. Co. of Pa.* v. *Pennsylvania*, 370 U. S. 607, 614–615 (1962). And it is that contact, rather than entry into the port, that provides the basis for taxing the ships. The tax situs requirement thus ensures that a State cannot avoid the proscriptions of the Tonnage Clause by redesignating a duty charged for the privilege of entering the port as an ad valorem tax.

The facts of this case illustrate the point. Most of petitioner's ships spend 40-to-50 days per year in the Port of Valdez. See App. 32–45. "[A]s a group the tankers form a continuous presence in the city." 182 P. 3d, at 623. The ships' prolonged physical presence and extensive commercial activities in the city have a substantial impact on the city's resources. On average, the ships' presence adds 550 people to the population of Valdez, increasing the city's total population by 10%. Those people, as well as the

ships themselves, require numerous public services, including harbor facilities, roads, bridges, water supply, and fire and police protection. *Ibid.* As the Alaska Supreme Court concluded, the challenged tax is therefore a legitimate property tax levied to support the ships' use of the city's services. See *ibid.*

## II

Even if the Tonnage Clause were properly understood to permit a jurisdiction to levy a tax on ships only when other property in the jurisdiction is also taxed, I would uphold the challenged tax. Although the tax applies only to ships, see Valdez Municipal Code §3.12.020, other property in the city is also subject to taxation.

First, §3.12.022 imposes a value-based property tax on trailers, mobile homes, and recreational vehicles that are affixed to a site and connected to utilities. The plurality makes much of the requirement that the property be "'affixed'" to a particular site, concluding that "Valdez in fact taxes those vehicles only when they constitute a form, not of personal property, but of real property." *Ante*, at 10. But the taxability of property pursuant to §3.12.022 is determined in much the same way as the taxability of ships. "A trailer or mobile home is conclusively presumed to be affixed to the land" and may therefore be taxed if "it has remained at a fixed site for more than ninety days." §3.12.022(C). Similarly, a ship owner can establish a tax situs in Valdez and thus be subject to taxation if it is "kept or used within the city for any ninety days or more." §3.12.020(C)(2)(c).[3] In both cases, the provision serves to impose a tax on property that has developed substantial contacts with the city. The plurality is thus wrong to

---

[3] A ship can also establish a tax situs in Valdez if it is usually kept or used within the city, travels to or within the city along regular routes, or is necessary to the conduct of substantial business in the city. §3.12.020(C)(2).

conclude that ships have been singled out for taxation.

Valdez also "levie[s] a tax" on all property taxable under Alaska Statutes Chapter 43.56 at the same rate that applies to other property taxed by the city. Valdez Municipal Code §3.28.010.[4] The tax is imposed on property used "primarily in the exploration for, production of, or pipeline transportation of gas or unrefined oil," including machinery, equipment, pumping stations, powerplants, aircraft and motor vehicles, and docks and other port facilities. See Alaska Stat. §§43.56.010, 43.56.210(5)(A) (2008). For several reasons, this tax is more significant than the plurality acknowledges. First, contrary to the plurality's view, the tax appears to be a municipal tax. Valdez Municipal Code §3.28.010 states that the tax "is hereby levied" on "property taxable under Alaska Statutes Chapter 43.56," which in turn states that "[a] municipality may levy" such taxes, §43.56.010(b). The terms of these provisions indicate that the city has exercised its express authority to levy such taxes. Given the myriad types of property taxable under those provisions and the requirement of Valdez Municipal Code §3.28.010 that the property be taxed "at the rate of taxation that applies to other property taxed by the city," it seems clear that petitioner's ships are taxed in the "same manner" as other property even as the plurality uses that term.

My view of the case would be the same even if the tax on property used in oil production were imposed by the State itself, as the plurality assumes. Whether the oil-production tax and the challenged tax are levied by the same unit of government has no relevance to the question whether the latter violates the Constitution. The restriction imposed by the Tonnage Clause is a command to the

_____

[4] As the plurality notes, *ante*, at 10–11, Valdez did not raise this issue in state court, and the parties have provided only limited briefing on the issue.

States limiting their inherent taxing authority as sovereigns. The States' political subdivisions have no such inherent power and can levy taxes only to the extent authorized by the State. See 16 E. McQuillin, Law of Municipal Corporations §44.05, pp. 19–24 (rev. 3d ed. 2003); see also *Wiggins Ferry*, 107 U. S., at 375 (noting "[t]he power of [a State] to authorize any city within her limits to impose a license tax" on ferries). Indeed, this aspect of the relationship between States and their political subdivisions is reflected in Alaska Stat. §43.56.010(b), which authorizes municipalities to levy certain taxes and prevents them from exempting particular property from taxation. Because the city's power to levy taxes derives from the State, whether the city or the State levies the tax on oil-production property is constitutionally irrelevant.

Finally, it bears mention that the result in this particular case does nothing to further the interests the Tonnage Clause was intended to protect. As the Court acknowledges, *ante*, at 4, the central purpose of the Clause is "to prevent the seaboard States, possessed of important ports of entry, from levying taxes on goods flowing through their ports to inland States," *Youngstown Sheet & Tube Co.* v. *Bowers*, 358 U. S. 534, 556 (1959) (Frankfurter, J., dissenting in part). Port Valdez is at the southern terminus of the Trans Alaska Pipeline System, which carries oil extracted from Alaska's North Slope to Port Valdez where it is loaded onto oil tankers belonging to petitioner and others for transport to refineries in other States. Taxes imposed on ships exporting that oil have the same effect on commerce in oil as do taxes on oil-production property or the oil itself, and Alaska's authority to impose taxes on oil and oil-production property is undisputed. From an economic or political point of view, there is no difference between Alaska's geographical control over the area in which the oil is produced and the port from which it is exported. Accordingly, no federal interest is served by

prohibiting Alaska or its political subdivisions from taxing the oil-bearing ships that are continually present in the State's ports.

## III

The Tonnage Clause permits a State to levy a property tax on ships whether or not it taxes other property. Were that not the case, the challenged tax would still be permissible because Valdez also taxes mobile homes, trailers, and a wide variety of property used in producing oil. Because the tax in my view does not run afoul of the prohibitions of the Tonnage Clause, I respectfully dissent.